ACCEPTED
04-16-00508-CR
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
9/26/2017 5:56 PM

No. 04-16-00508-CR

## COURT OF APPEALS
### FOR THE FOURTH JUDICIAL DISTRICT
### SAN ANTONIO, TEXAS

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

09/26/17 5:56:59 PM

KEITH E. HOTTLE
CLERK

| | | |
|---|---|---|
| **MIGUEL AGUILAR, JR.,** | § | |
| **Appellant,** | § | **Appeal from the** |
| **versus** | § | **of Webb County, Texas** |
| | § | **Cause No. 2014-CRS-00-1753** |
| **THE STATE OF TEXAS,** | § | **D4** |
| **Appellee.** | § | |
| | § | |

## NOTICE OF EXHIBITS

**CYNTHIA E. ORR**
**Bar No. 15313350**
**GOLDSTEIN, GOLDSTEIN & HILLEY**
**310 S. ST. MARY'S ST.**
**29th Floor Tower Life Bldg.**
**San Antonio, Texas 78205**
**Phone: 210-226-1463**
**Facsimile: 210-226-8367**
**Email: whitecollarlaw@gmail.com**

**ROBERT G. RODERY**
**Bar No. 24069072**
**LAW OFFICE OF ROBERT G. RODERY**
**310 S. St. Mary's St. Ste. 1205**
**San Antonio, Texas 78205**
**Phone: 210-227-9399**
**Facsimile: 210-229-1445**
**Email: rrodery.law@gmail.com**

1

**COURT OF
APPEALS
FOR THE FOURTH JUDICIAL
DISTRICT SAN ANTONIO, TEXAS**

---

| | | |
|---|---|---|
| **MIGUEL AGUILAR, JR.,** | § | |
| **Appellant,** | § | **Appeal from the** |
| **versus** | § | **of Webb County, Texas** |
| | § | **Cause No. 2014-CRS-00-1753** |
| **THE STATE OF TEXAS,** | § | **D4** |
| **Appellee.** | § | |

---

## NOTICE OF EXHIBITS

TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS, FOURTH JUDICIAL DISTRICT:

NOW COMES, Appellant, MIGUEL AGUILAR, by and through undersigned counsel, respectfully submits notice of the following:

Copies of the cases to the Notice of Intervening & Supplemental Authority are attached in accordance to with the local rules.

Respectfully submitted:

/s/ Cynthia E. Hujar Orr

CYNTHIA E. ORR
Bar No. 15313350
GOLDSTEIN, GOLDSTEIN & HILLEY

310 S. ST. MARY'S ST.
29th Floor Tower Life Bldg.
San Antonio, Texas 78205
Phone: 210-226-1463
Facsimile: 210-226-8367
Email: whitecollarlaw@gmail.com


Robert G. Rodery
Bar No. 24091107
LAW OFFICE OF ROBERT G. RODERY
310 S. St. Mary's St.
Suite 1215
San Antonio, Texas 78205
Phone: 210-227-9399
Facsimile: 210-229-1445
E-mail: rrodery.law@gmail.com


Attorneys for Appellant,
   MIGUEL AGUILAR

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above foregoing Appellant's Brief has been served electronically, in compliance with Tex. R. App. P. 9.5(b)(1) to David Reuthinger, Assistant District Attorney, 1110 Victoria, Suite 401, Laredo, Texas, 78040, on this the 25th day of September, 2017.

By: /s/ Cynthia E. Hujar Orr


# Franklin v. State

Court of Criminal Appeals of Texas

June 30, 2004, Delivered

NO. 1481-00

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

09/26/17 5:56:59 PM

KEITH E. HOTTLE
CLERK

## Reporter

138 S.W.3d 351 *; 2004 Tex. Crim. App. LEXIS 1118 **

B. J. FRANKLIN, Appellant v. THE STATE OF TEXAS

**Notice:** **[**1]** PUBLISH.

**Prior History:** ON STATE'S PETITION FOR DISCRETIONARY REVIEW FROM THE SIXTH COURT OF APPEALS. BOWIE COUNTY.

Franklin v. State, 23 S.W.3d 81, 2000 Tex. App. LEXIS 3374 (Tex. App. Texarkana, 2000)

**Disposition:** Affirmed.

## Core Terms

juror, questions, voir dire, court of appeals, trial court, impartial jury, biased, peremptory challenge, mistrial, bias, intelligently, withheld, trial judge, material information, challenge for cause, defense counsel, actual bias, withholding, trial judge's, deprived, right to trial, juror bias, impartial, refuse to permit, girl scout, parties, argues, troop, grant a mistrial, fail to answer

## Case Summary

### Procedural Posture

On remand, the Sixth Court of Appeals, Bowie County (Texas), reversed defendant's aggravated sexual assault of a child conviction because a juror's failure to accurately answer defense counsel's voir dire questions prevented him from intelligently exercising peremptory strikes or from requesting a challenge for cause. The State petitioned for discretionary review, which the court of criminal appeals granted.

### Overview

The juror withheld material information that she was the victim's assistant Girl Scout troop leader, and that her daughter was also in the same Girl Scout troop as the victim. The trial judge, who was informed of the relationship between the juror and the victim, refused to grant a mistrial and denied defendant the opportunity to discover whether the relationship affected defendant's right to a trial by an impartial jury. The trial judge also deprived defendant of the ability to develop evidence of bias or prejudice on the record. The fact that the juror had a relationship with the victim, one that many people would consider almost a parental role, certainly had a tendency to show bias. Because the trial court refused to admit the information that would have permitted the appellate court to apply a harm analysis to the juror's failure to answer counsel's voir dire questions accurately, there was an absence of evidence that would allow the appellate court to determine beyond a reasonable doubt that the error did not contribute to defendant's conviction. Thus, the appellate court properly applied the standard of harm in defendant's case and properly reversed his conviction.

### Outcome

The court of criminal appeals affirmed the appellate court's judgment.

Page 2 of 16

138 S.W.3d 351, *351; 2004 Tex. Crim. App. LEXIS 1118, **1

# LexisNexis® Headnotes

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

## *HN1*[⬇] **Appeals, Standards of Review**

Under Tex. R. App. P. 44.2, the standard of review for errors of a constitutional dimension differs from the standard for other errors.

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Constitutional Rights

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > General Overview

## *HN2*[⬇] **Harmless & Invited Error, Constitutional Rights**

See Tex. R. App. P. 44.2.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

## *HN3*[⬇] **Criminal Process, Right to Jury Trial**

Constitutional provisions bear on the selection of a jury for the trial of a criminal case. However, not every error in the selection of a jury violates the constitutional right of a trial by an impartial jury.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

## *HN4*[⬇] **Criminal Process, Right to Jury Trial**

The Sixth Amendment guarantees the right to a trial before an impartial jury.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

## *HN5*[⬇] **Criminal Process, Right to Jury Trial**

Part of the constitutional guarantee of the right to an impartial jury in the Sixth Amendment includes adequate voir dire to identify unqualified jurors.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > ... > Defendant's Rights > Right to Counsel > Constitutional Right

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

## *HN6*[⬇] **Criminal Process, Right to Jury Trial**

Essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury is the right to question veniremembers in order to intelligently exercise peremptory challenges and challenges for cause.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

Page 3 of 16

138 S.W.3d 351, *351; 2004 Tex. Crim. App. LEXIS 1118, **1

Criminal Law & Procedure > ... > Challenges to Jury Venire > Bias & Prejudice > General Overview

*HN7*[⬇]  **Criminal Process, Right to Jury Trial**

Where a juror withholds material information during the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury. The fact that a juror will state that the fact that he withheld information will not affect his verdict is not dispositive of the issue where the information is material and therefore likely to affect the juror's verdict.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

*HN8*[⬇]  **Criminal Process, Right to Jury Trial**

The fact that a juror did not intend to intentionally withhold information during voir dire is largely irrelevant when considering the materiality of information withheld.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

Criminal Law & Procedure > ... > Challenges to Jury Venire > Bias & Prejudice > General Overview

*HN9*[⬇]  **Criminal Process, Right to Jury Trial**

Under Texas law, a defendant must show that a

juror withheld material information during voir dire, and the information is withheld despite due diligence exercised by the defendant. So, it is not necessary that the concealed information show actual bias; just that it has a tendency to show bias.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

*HN10*[⬇]  **Criminal Process, Right to Jury Trial**

A defendant has no right that any particular individual serve on the jury. The defendant's only substantial right is that the jurors who do serve be qualified.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > ... > Defendant's Rights > Right to Counsel > Constitutional Right

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

*HN11*[⬇]  **Criminal Process, Right to Jury Trial**

When a defendant is prevented from questioning the venire, he is prevented from obtaining information, which implicates constitutional protections.

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

Criminal Law & Procedure > Juries & Jurors > Peremptory Challenges > General Overview

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

Page 4 of 16

138 S.W.3d 351, *351; 2004 Tex. Crim. App. LEXIS 1118, **1

Criminal Law & Procedure > ... > Defendant's Rights > Right to Counsel > Constitutional Right

## HN12[⬇] Counsel, Right to Counsel

A defendant's constitutional right to counsel requires that counsel be permitted to question the members of the jury panel in order to intelligently exercise peremptory challenges.

Criminal Law & Procedure > ... > Defendant's Rights > Right to Counsel > Constitutional Right

Criminal Law & Procedure > Counsel > Right to Counsel > General Overview

Criminal Law & Procedure > Juries & Jurors > Peremptory Challenges > General Overview

Criminal Law & Procedure > Juries & Jurors > Voir Dire > General Overview

## HN13[⬇] Right to Counsel, Constitutional Right

Tex. Const. art. I, § 10 guarantees the right to counsel, which includes the right of counsel to question members of the venire panel in order to intelligently exercise peremptory challenges.

**Counsel:** FOR APPELLANT: CRAIG HENRY, Texarkana, TX.

FOR STATE: BETTY MARSHALL, ASST. ST. PRO. ATT., Austin, TX.

**Judges:** Keasler, J., delivered the opinion of the Court, in which Price, Johnson, Hervey, and Holcomb, JJ., joined. Keller, P.J., filed a dissenting opinion. Cochran, J., filed a dissenting opinion in which Meyers, J., joined. Womack, J., dissented without opinion.

**Opinion by:** KEASLER

## Opinion

**[*352]** We granted review in this case to determine whether the Court of Appeals erred in applying a constitutional harm analysis to the trial court's denial of a mistrial after one of the jurors revealed during trial that she knew the victim. We conclude that it did not.

### Facts

During voir dire at B. J. Franklin's trial, defense counsel asked the veniremembers if they knew any of the participants in the trial. None of the jurors indicated that they knew the participants. But when the State called its first witness--the victim--to the stand, Juror Spradlin notified the judge that she knew the victim because Spradlin was the assistant leader of the victim's girl scout troop and that her **[**2]** daughter was also in that troop. Spradlin told the judge that she had not recognized the victim's name during voir dire but recognized the victim when she saw her at trial. The trial judge asked Spradlin if she could listen to the evidence in the case and base her judgment just on what she heard from the stand. Spradlin stated that she could.

Defense counsel moved for a mistrial, stating that if he had known about the relationship between Spradlin and the victim, he would have exercised a peremptory challenge against Spradlin. Defense counsel also requested to ask Spradlin some additional questions about her relationship with the victim. When the trial judge refused to allow additional questioning, defense counsel objected that his client's due process rights were being violated. He stated that he would have asked Spradlin about her relationship with the victim, how long the relationship lasted, whether or not she could set aside that relationship in deciding the case, and whether she would give more or less credence to the victim's testimony and truthfulness due to the relationship. Defense counsel stated that the judge was preventing him from developing any

Page 5 of 16

138 S.W.3d 351, *352; 2004 Tex. Crim. App. LEXIS 1118, **2

testimony regarding **[**3]** potential biases. The judge overruled defense counsel's objections and denied the motion for mistrial.

## Procedural History

Franklin was convicted of aggravated sexual assault of a child, and the jury sentenced him to life in prison. Franklin appealed, arguing that the trial court erred in denying the motion for mistrial "based upon a juror's failure to accurately answer questions during voir dire and also because he was unable to intelligently exercise his peremptory strikes as a result of that failure." **[*353]** [1] The Sixth Court of Appeals affirmed his conviction, finding that although the trial court erred in refusing to permit further questioning of the juror, Franklin failed to preserve error because he did not request to make a bill of exceptions "that would have explored the relationship between the juror and the victim, thus providing information from which [the Court of Appeals] could assess whether the information was truly material." [2]

**[**4]** We granted Franklin's petition for discretionary review, which claimed along with three other grounds for review that the information Spradlin withheld was material and that he had preserved the issue for review. We concluded that Franklin had preserved error and that the information withheld by Spradlin was material. [3] We remanded the cause to the Court of Appeals to conduct a harm analysis. [4]

On remand, the Court of Appeals reversed Franklin's conviction. It determined that the error was of a constitutional dimension subject to harm analysis under Rule 44.2(a). [5] The Court of Appeals

found that Juror Spradlin's failure to accurately answer counsel's voir dire questions prevented him from intelligently exercising peremptory strikes or from requesting a challenge for cause. [6] It reasoned that "a defendant's constitutional right to counsel requires that counsel be permitted to question the jury panel in order **[**5]** to intelligently exercise peremptory challenges," so Spradlin's withholding of material information was of constitutional dimension. And because the trial judge refused to admit information that would have permitted the Court of Appeals to "apply a harm analysis to the juror's failure to answer counsel's voir dire questions accurately," it could not determine beyond a reasonable doubt that the error did not contribute to Franklin's conviction. [7]

We then granted the State's petition for discretionary review, which contends that the Court of Appeals erred in analyzing the improper limitation of defense questioning for harm under Rule 44.2(a) of the Texas Rules of Appellate Procedure. The State also argues that the Court of Appeals erred in holding that the improper limitation of defense counsel questioning in this case was harmful where **[**6]** the record does not show that the jury was not fair and impartial.

## Analysis

The State characterizes the error at issue here as follows: "Is there a constitutional right for counsel to ask questions that are relevant only the to the exercise of peremptory challenges?" The Court of Appeals rejected the characterization of the issue in those terms, [8] as do we. The error at issue here is the trial judge's denial of a mistrial when, after the trial began, Juror Spradlin revealed that she knew the victim. The trial judge's refusal to allow defense counsel to ask Juror Spradlin questions about her

---

[1] *Franklin v. State*, 986 S.W.2d 349, 352 (Tex. App.--Texarkana 1999).

[2] *Id.* at 354-55.

[3] *Franklin v. State*, 12 S.W.3d 473, 479 (Tex. Crim. App. 2000).

[4] *Id.*

[5] *Franklin v. State*, 23 S.W.3d 81, 83 (Tex. App.--Texarkana 2000);

TEX. R. APP. P. 44.2(a).

[6] *Franklin,* 23 S.W.3d at 83.

[7] *Id.*

[8] *Id.* at 82-83.

Page 6 of 16

138 S.W.3d 351, *353; 2004 Tex. Crim. App. LEXIS 1118, **6

relationship with the victim is considered in the harm analysis, but it is not primarily the error in question. Because the jury had been sworn and the trial had begun, the appellant's **[\*354]** only remedy was a mistrial; defense counsel could not have moved to challenge the juror for cause or to peremptorily strike the juror. So, the issue here is what standard of harm should be applied to the trial judge's denial of a mistrial based on the juror's withholding of material information.

**[\*\*7]** *HN1*[⬆] Under Texas Rule of Appellate Procedure 44.2, the standard of review for errors of a constitutional dimension differs from the standard for other errors. [9] The rule provides that:

*HN2*[⬆] (a) *Constitutional error*. If the record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

(b) *Other errors*. Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded. [10]

Was a constitutional right affected by the juror's withholding of material information during voir dire and the judge's subsequent denial of a mistrial, compounded **[\*\*8]** by the trial court's refusal to allow defense counsel to ask questions to develop a record of actual bias or prejudice? We have said before that *HN3*[⬆] "constitutional provisions bear on the selection of a jury for the trial of a criminal case." [11] And while not every error in the selection of a jury violates the constitutional right of a trial by an impartial jury, [12] we conclude that the error in this case did violate that right.

*HN4*[⬆] The Sixth Amendment guarantees the right to a trial before an impartial jury. [13] *HN5*[⬆] Part of the constitutional guarantee of the right to an impartial jury includes adequate voir dire to identify unqualified jurors. [14] And we have consistently held that *HN6*[⬆] essential to the Sixth Amendment guarantees of the assistance of counsel and trial before an impartial jury "is the right to question veniremembers in order to intelligently exercise peremptory challenges and challenges for cause." [15] **[\*\*10]** In *Salazar* **[\*\*9]** *v. State*, we held that *HN7*[⬆] "where a juror withholds material information during the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." [16] We also found "that a juror will state that the fact that he withheld information will not affect his verdict is not dispositive **[\*355]** of the issue where the information is material and therefore likely to affect the juror's verdict." [17] *HN8*[⬆] The fact that the juror did not intend to intentionally withhold information "is largely irrelevant when considering the materiality of information withheld." [18]

Here, Juror Spradlin withheld material information--that she was the victim's assistant Girl Scout troop leader, and that her daughter was also in the same

---

[9] TEX. R. APP. P. 44.2.

[10] *Id.*

[11] *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998).

[12] *Id.*

[13] U.S. CONST. amend VI.

[14] *Morgan v. Illinois*, 504 U.S. 719, 729, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992).

[15] *Raby v. State*, 970 S.W.2d 1, 10 (Tex. Crim. App. 1998); *Linnell v. State*, 935 S.W.2d 426, 428 (Tex. Crim. App. 1996) (citing *Nunfio v. State*, 808 S.W.2d 482, 485 (Tex. Crim. App. 1991)); *Dinkins v. State*, 894 S.W.2d 330, 344-345 (Tex. Crim. App. 1995); *Burkett v. State*, 516 S.W.2d 147, 148 (Tex. Crim. App. 1974); *Hernandez v. State*, 508 S.W.2d 853, 854 (Tex. Crim. App. 1974); *McCarter v. State*, 837 S.W.2d 117, 119 (Tex. Crim. App. 1992); *Naugle v. State*, 118 Tex. Crim. 566, 568, 40 S.W.2d 92, 94 (1931); *see also Janecka v. State*, 937 S.W.2d 456, 471 (Tex. Crim. App. 1996); *Smith v. State*, 676 S.W.2d 379, 384 (Tex. Crim. App. 1984); *Mathis v. State*, 167 Tex. Crim. 627, 628, 322 S.W.2d 629, 631 (1959).

[16] *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. 1978).

[17] *Id.*

[18] *Franklin*, 12 S.W.3d at 478.

Page 7 of 16

138 S.W.3d 351, *355; 2004 Tex. Crim. App. LEXIS 1118, **9

Girl Scout troop as the victim--that prevented Franklin not only from intelligently exercising his peremptory challenges but from exercising a challenge for cause as well. And, under *Salazar*, Spradlin's statement to the trial judge that she could consider the evidence and base her decision on the evidence does not mean that Franklin was not deprived of an impartial jury. [19] The trial judge, informed of the relationship between Spradlin and the victim, refused to grant a mistrial and denied Franklin the opportunity to discover whether the relationship affected Franklin's right to a trial by an impartial jury.

 [**11]  And the error did not end there. The trial judge also deprived Franklin of the ability to develop evidence of bias or prejudice on the record. In this case, defense counsel told the court:

> Had I been allowed to ask questions, I would have asked questions concerning the nature of the relationship with [the victim], how long it had lasted, whether or not she could set aside any of her relationship with [the victim], in sitting in judgment in this particular case, or whether she would tend to give more credence or less credence to [the victim]'s testimony and truthfulness due to that relationship.

Counsel explained that these questions were relevant to Spradlin's "potential biases" and would have uncovered information relevant to a challenge for cause. But the trial court refused to allow counsel to ask these questions, which we interpreted as "a direct order not to ask the questions." [20] The trial judge's refusal to allow defense counsel to ask Juror Spradlin questions regarding the nature and extent of the relationship deprived Franklin of the ability to show actual bias or prejudice. We hesitate to hold Franklin to a burden of showing actual bias or prejudice **[**12]**  when the trial judge denied him the ability to develop evidence of

actual bias or prejudice on the record. We believe that all of these factors together--Juror Spradlin's failure to reveal her relationship to the victim, the judge's denial of a mistrial, and the trial judge's refusal to allow defense counsel to question Spradlin about her relationship to the victim--affected Franklin's right to a trial by an impartial jury. So, we conclude that the Court of Appeals properly applied the constitutional standard of harm under Rule 44.2(a).

Judge Cochran's dissent argues that we should apply the federal standard that Franklin must show that Juror Spradlin had actual bias. Under the federal standard, the defendant must not only show that the juror failed to provide an honest answer to a material question during voir dire but also that a correct response would have provided the basis for a challenge for cause. [21] What Judge Cochran advocates is not and has never **[**13]**  been the standard in Texas. *HN9*[⬆] Under Texas law, the defendant **[*356]** must show that the juror withheld material information during voir dire, and the information is withheld despite due diligence exercised by the defendant. [22] So, "it is not necessary that the concealed information show actual bias; just that it has a tendency to show bias." [23] The fact that Spradlin had a relationship with the victim, one that many people would consider almost a parental role, certainly has a tendency to show bias.

The State argues that, by analyzing the error for harm under Rule 44.2(a), the Court of Appeals has issued an opinion that conflicts with our reasoning in *Jones v. State*. [24] **[**15]**  In *Jones* **[**14]** , we found that an error in granting the State's challenge

---

[19] *See Salazar,* 562 S.W.2d at 482.

[20] *Franklin,* 12 S.W.3d at 477.

---

[21] *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 78 L. Ed. 2d 663, 104 S. Ct. 845 (1984).

[22] *See Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980).

[23] Robert G. Loewy, Note: *When Jurors Lie: Differing Standards for New Trials*, 22 AM. J. CRIM. L. 733, 743 (1995).

[24] *Jones v. State*, 982 S.W.2d 386 (Tex. Crim. App. 1998).

Page 8 of 16

138 S.W.3d 351, *356; 2004 Tex. Crim. App. LEXIS 1118, **14

for cause was not of a constitutional dimension. [25] We noted that "while it is true, as appellant argues, that the Constitution guarantees to an accused the right to a speedy trial by an impartial jury, it does not follow that the rejection of [allegedly] unqualified persons for insufficient cause would deprive appellant of that right." [26] Significant in our decision was that "no claim [was] made that the jury, as finally constituted, was biased or prejudiced; or that appellant was deprived of a trial by an impartial jury." [27] We stated that *HN10*[⬆] "a defendant has no right that any particular individual serve on the jury. The defendant's only substantial right is that the jurors who do serve be qualified." [28] But here, Franklin's claims stem from the trial court's denial of a mistrial based on Juror Spradlin's revelation during trial that she knew the victim and that this deprived him of a trial by an impartial jury. We find that the State's reliance on *Jones* is misplaced.

This case is also distinguishable from *Johnson v. State,* [29] where we held that the erroneous denial of a challenge for cause is subject to a harm analysis under Rule 44.2(b). [30] As we noted in *Taylor v. State*, *HN11*[⬆] when a defendant is prevented from questioning the venire, he is prevented from obtaining information, which implicates constitutional protections. [31] But an erroneous denial of a challenge for cause does not prevent the defendant from obtaining information; the defendant has elicited information from the jury with which he can intelligently exercise his challenges for cause or peremptory challenges.

---

[25] *Id.* at 391-92.

[26] *Id.* at 391.

[27] *Id.*

[28] *Id.* at 393.

[29] *Johnson v. State*, 43 S.W.3d 1(Tex. Crim. App. 2001).

[30] *Id.* at 2; Tex. R. App. P. 44.2(b).

[31] *See Taylor v. State*, 109 S.W.3d 443, 451-52 (Tex. Crim. App. 2003).

Here, Franklin never had the opportunity to challenge Spradlin for cause or to strike her based on her relationship with the victim, and this implicated his constitutional right to a trial by an impartial jury. Because the erroneous denial of a challenge for cause is not at issue here, we are not bound to apply the standard of harm associated with that **[**16]** error.

The Court of Appeals found that because *HN12*[⬆] "a defendant's constitutional right to counsel requires that counsel be permitted to question the members of the jury panel in order to intelligently exercise peremptory **[*357]** challenges," the error involved in this case was of constitutional dimension. [32] We have held that Article I, § 10, of the Texas Constitution *HN13*[⬆] guarantees the right to counsel, which includes the right of counsel to question members of the venire panel in order to intelligently exercise peremptory challenges. [33] But regardless of whether that type of error occurred, we believe that Juror Spradlin's withholding of material information, the judge's denial of a mistrial, and the judge's refusal to allow defense counsel to ask Spradlin additional questions adversely affected **[**17]** Franklin's right to a fair and impartial trial. Because we conclude that the trial court's failure to grant a mistrial after Spradlin revealed that she withheld material information is constitutional error, we need not address whether the error implicated Franklin's right to counsel. So we agree with the Court of Appeals that the proper standard is the constitutional standard, but for a different reason.

Judge Keller's dissent argues that our harm analysis in this case conflicts with our recent decision in *Hawkins v. State.* [34] In *Hawkins*, we stated that whether a judge's failure to grant a mistrial constitutes error inherently involves conducting a

---

[32] *Franklin*, 23 S.W.3d at 83.

[33] *Howard v. State*, 941 S.W.2d 102, 108 (Tex. Crim. App. 1996).

[34] *Hawkins v. State,* No. 571-03, 135 S.W.3d 72, 2004 Tex. Crim. App. LEXIS 899, at * 9 (Tex. Crim. App. May 19, 2004).

Page 9 of 16

138 S.W.3d 351, *357; 2004 Tex. Crim. App. LEXIS 1118, **17

harm analysis. [35] We said that determining whether there is error involves determining whether the trial judge made a mistake. [36]But here, the issue is not whether the judge made a mistake. We already concluded in *Franklin* [**18] *I* that the trial judge did make a mistake. [37] And despite the various characterizations of that mistake by the parties and the Court of Appeals, the trial judge's only remedy to correct the error was to grant a mistrial, which he did not do. So, the only issue before us now is whether the Court of Appeals used the proper standard of harm in evaluating that error. Our analysis therefore is not at odds with *Hawkins*.

Judge Keller's dissent also asserts that our "only real argument for finding a violation of the right to an impartial jury is that there does not exist enough information to determine whether the juror is biased" and that we do not "explain why, *from a constitutional perspective*, it is not enough that the trial court conducted its own inquiry." [38] [**19] She states that there was not any evidence in the record that Juror Spradlin was biased, and in fact that there was evidence that Juror Spradlin was not biased based on her responses to the trial judge's questioning. [39] As we stated before, the issue before us is not whether the trial judge's ruling was error, but what standard of harm to apply to that error. And as we noted in response to Judge Cochran's dissent, the defendant does not have to show evidence of actual bias; the defendant need only show that the juror withheld material information despite the defendant's due diligence in eliciting that information. [40]

Judge Keller further states that if we are

"contending that there is a constitutional basis for requiring a trial court to allow the *parties* to question the juror, [*358] [we] have not explained what constitutional provision imposes such a requirement or [**20] why it does." [41] But we do not hold here that Franklin had a constitutional right to ask the juror additional questions during trial. What we do hold is that because Franklin was unable to ask those questions during voir dire in order to intelligently exercise his strikes based on that information, he was denied the right to a fair and impartial jury. As we stated before, the fact that the judge would not allow Franklin to ask the juror additional questions at trial compounded the situation since he could not then affirmatively get any evidence of bias on the record.

In its second ground for review, the State argues that the Court of Appeals erred in finding harmful error where the record does not show that the jury was not fair and impartial. The State bases its argument on the premise that the proper standard for evaluating the harm is under Rule 44.2(b), and because Franklin was not denied a fair and impartial jury, the error is harmless. But under Rule 44.2(a), the proper [**21] standard of harm in this case, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." [42] The Court of Appeals did not have to find that the jury was not fair and impartial. Instead, the Court of Appeals was required to reverse the conviction unless it determined beyond a reasonable doubt that the trial court's denial of a mistrial after Juror Spradlin revealed that she knew the victim did not contribute to Franklin's conviction or punishment. The Court of Appeals in this case found that because the trial court "refused to admit the information that would have permitted [it] to apply a harm analysis to the juror's failure to answer counsel's voir dire questions accurately,"

---

[35] *Id.*

[36] *Id.*

[37] *Franklin v. State*, 12 S.W.3d 473, 478-79 (Tex. Crim. App. 2000).

[38] *Post*, slip. op. at 6.

[39] *Id.* at 6.

[40] *See Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980).

[41] *Post*, slip. op. at 6-7.

[42] TEX. R. APP. P. 44.2(a).

Page 10 of 16

138 S.W.3d 351, *358; 2004 Tex. Crim. App. LEXIS 1118, **21

there was an "absence of evidence that would allow [it] to determine beyond a reasonable doubt that the error did not contribute to the conviction." [43] The Court of Appeals properly applied the standard of harm in this case.

**[\*\*22] Conclusion**

We find that the Court of Appeals did not err in analyzing the trial judge's denial of a mistrial based on a juror's withholding of material information under Rule 44.2(a). [44] The Court of Appeals' judgment is affirmed.

DATE DELIVERED: June 30, 2004

KELLER, P.J., filed a dissenting opinion.

**Dissent by:** KELLER; COCHRAN

# Dissent

*DISSENTING OPINION*

The Court characterizes the issue as "what standard of harm should be applied to the trial judge's denial of a mistrial" based on the juror's withholding of material information. [1] But as we recently explained in *Hawkins v. State*, the question is not whether the defendant was harmed by the court's denial of a mistrial, but whether the trial court erred in the first place by refusing to grant a mistrial. [2] The harm analysis is built into the determination of whether the trial court abused its **[\*359]** discretion by denying a mistrial. [3] The Court's harm analysis is, therefore, directly at odds with our recent holding **[\*\*23]** in *Hawkins*. [4]

---

[43] *Franklin,* 23 S.W.3d at 83.

[44] TEX. R. APP. P. 44.2(a).

[1] Court's op. at 5.

[2] 135 S.W.3d 72, 2004 Tex. Crim. App. LEXIS 899, *9 (May 19, 2004).

[3] *Id.*at *10.

[4] *Id.*

The Court contends that "we already concluded in *Franklin I* [5] that the trial judge did make a mistake" and therefore the only issue before us is the proper standard of harm. [6] But *Franklin I* did not in fact determine that the trial judge committed error in denying the request for a *mistrial*. Rather *Franklin I* agreed with the Court of Appeals's determination that the trial court erred in refusing to permit defense questioning of the juror. [7] The intermediate appellate court declined to reverse on the basis of that alleged error because it believed the error was not preserved [8] and, as a consequence, that it was impossible to determine whether the new information was "material." [9] *Franklin I* disagreed with those determinations -- holding that appellant had preserved his complaint [10] and that the new information was indeed "material." [11] **[\*\*24]** *Franklin I* did not, and could not have, addressed whether the trial court made a mistake in denying the *mistrial* because the Court of Appeals never addressed whether the trial court erred in that regard.

On remand from *Franklin I*, the Court of Appeals confused the issue of what error was being addressed. That court indicated that the error was not simply the refusal to permit questioning at trial but also somehow involved counsel's inability to exercise for cause and **[\*\*25]** peremptory strikes at voir dire:

The State argues that the error before this Court is solely the trial court's refusal to permit

---

[5] *Franklin v. State*, 12 S.W.3d 473 (Tex. Crim. App. 2000).

[6] Court's op. at 11.

[7] Franklin, 12 S.W.3d at 479 ("The trial court erred in denying appellant the opportunity to ask questions of Juror Spradlin."); *see also Franklin v. State*, 986 S.W.2d 349, 353 (Tex. App.-Texarkana 1999).

[8] *Franklin*, 986 S.W.2d at 353-354.

[9] *Id.* at 354-355.

[10] *Franklin*, 12 S.W.3d at 477.

[11] *Id.* at 477-478.

Page 11 of 16

138 S.W.3d 351, *359; 2004 Tex. Crim. App. LEXIS 1118, **25

counsel to question the juror. This view is not supported either by our initial opinion or by the opinion of the Court of Criminal Appeals. In the Court of Criminal Appeal's opinion, it first determined that error had been preserved for review -- that error being the refusal to permit questioning of the juror. The Court of Criminal Appeals then discussed the question of whether the information withheld by the juror *during voir dire* was material. If that information was material, then counsel was unable, through no fault of his own, to intelligently exercise his peremptory strikes or to request a strike for cause on this juror. The Sixth Amendment guarantees the "assistance of counsel" and a trial before "an impartial jury." Part of this constitutional guarantee is an adequate voir dire to identify unqualified jurors. Essential to this guarantee is the right to question venire members in order to intelligently exercise peremptory challenges and challenges for cause. In other words, a defendant's constitutional right to counsel requires that counsel [**26] be permitted to question the members of the jury panel in order [*360] to intelligently exercise peremptory challenges. [12]

Although the Court of Appeals contended that its more expansive view of the nature of the error was supported by its own and our opinions, as discussed above, neither of those previous opinions isolated any error other than the refusal to permit questioning at trial. The lower court apparently interpreted the "materiality" discussion as invoking its more expansive view of error, but the lower court's prior opinion had in fact held that materiality could not be determined due to an inadequate record, [13] and *Franklin I*'s discussion of materiality related to our holding that the trial court erred in refusing to permit questioning. [14]

[**27] The upshot of all this is that the exact identity of the error at issue remains unresolved. Originally, the isolated error was the refusal to permit the defense to question the juror at trial. On remand, the Court of Appeals suggested that the error was the deprivation of appellant's right to intelligently exercise peremptory and for cause challenges. For the first time, the Court characterizes the error as the failure to grant a mistrial. The Court may be correct in recasting the error issue at this late stage, just as we did in *Hawkins*, but then the remaining discussion of error and harm must be recast as well. It is inconsistent to recast the error for the first time and then claim that the error issue was resolved in a prior decision.

And the Court's failure to recast the issues under *Hawkins* creates problems with its analysis regarding which harm standard to apply. The Court suggests that a constitutional standard of harm applies in the present context because appellant was unable to ask questions in voir dire in order to intelligently exercise for cause and peremptory challenges, and this denied him the right to trial by a fair and impartial jury. But the right to [**28] intelligently exercise challenges is a separate right from the right to an impartial jury. I do not see any necessary connection between the two.

If the juror were biased and could not set that bias aside, then the right to an impartial jury would be undermined. But whether appellant would have exercised a peremptory challenge, or raised a challenge for cause, do not by themselves establish that the juror in question was biased. Nor was there any evidence in this record that she was biased. In fact, there was evidence, from the juror's response to the trial court's questioning, that she was *not* biased. The Court does not adequately explain why we should override the trial court's determination that the juror was not biased when there is evidence in the record to support that ruling. It is true that we stated in *Salazar* that a juror's statement that the information withheld would not affect his verdict is

[12] *Franklin v. State*, 23 S.W.3d 81, 83 (Tex. App.-Texarkana 2000)(emphasis in original; internal citations omitted).

[13] *See* above discussion.

[14] 12 S.W.3d at 478-479.

Page 12 of 16

138 S.W.3d 351, *360; 2004 Tex. Crim. App. LEXIS 1118, **28

not dispositive when the information is material. [15] But such a statement is at least questionable in light of much more recent pronouncements from this Court upholding a trial court's ruling regarding a juror's ability to serve impartially on the case when that ruling is [**29] supported by the record. [16]

Moreover, in *Salazar*, upon which the Court relies, it is clear that the juror intentionally [*361] withheld the information. [17] [**30] In the case at bar, however, the juror did not intentionally withhold the information. [18] In *Franklin I*, we held that the good faith of the juror is largely irrelevant when considering the materiality of the information withheld. [19] But while good faith may be irrelevant to the materiality of the information, it should be relevant to whether the trial court is free to believe the juror when she says that the information will not affect her deliberations.

The Court's only real argument for finding a violation of the right to an impartial jury is that there does not exist enough information to determine whether the juror is biased. But the Court does not explain how it arrives at that conclusion. The trial court questioned the juror and received her verbal assurance of impartiality. The Court has not explained how the trial court's questioning was deficient. The Court says that appellant should not be held to the burden of proving bias or prejudice when he was not allowed to ask questions, but the Court does not explain why, *from a constitutional perspective*, it is not enough that the trial court conducted its own inquiry. In fact, that's what happened in *Salazar*: the trial court conducted its own inquiry without the assistance of the parties. [20]

If the Court is contending that there is a constitutional basis for requiring a trial court to allow the *parties* to question the juror, it has not explained what constitutional provision imposes such a requirement or why it [**31] does.

Arguably, a right of defense counsel to question the juror stems from the right to make a bill of exceptions, but that right appears to stem from common law and court rules rather than the United States or Texas constitutions. [21]

Perhaps the Court is echoing the Court of Appeals's conclusion that the error in this case is the deprivation of the intelligent use of strikes. If that were the error, however, the logical place for that error to have occurred would be during voir dire. But the trial court committed no such error in voir dire. To find such an error in voir dire, we would have [**32] to make an exception to the general principle, discussed in *Hawkins*, that error occurs only when the trial court makes a mistake and hold that a juror's conduct could, by itself, create error to be complained about on appeal. Moreover, to help appellant in this case, we would have to further hold that such error could occur even when the juror acted in good faith and did not intentionally withhold information. I see no persuasive reason to make such an exception to *Hawkins*.

I respectfully dissent.

KELLER, Presiding Judge

Date filed: June 30, 2004

COCHRAN, J., *filed a dissenting opinion in which* MEYERS, J., *joined.*

## O P I N I O N

I respectfully dissent.

---

[15] *Id.* at 482.

[16] *Quinn v. State*, 958 S.W.2d 395, 402 (Tex. Crim. App. 1997); *see also Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000).

[17] 562 S.W.2d at 482 ("It is clear that juror Wooley was in violation of his oath when he withheld information during voir dire").

[18] *Franklin*, 12 S.W.3d at 478.

[19] *Id.*

[20] *Salazar v. State*, 562 S.W.2d 480, 481-482 (Tex. Crim. App. 1978).

[21] *See Spence v. State*, 758 S.W.2d 597, 599-600 (Tex. Crim. App. 1988), *cert. denied*, 499 U.S. 932, 113 L. Ed. 2d 271, 111 S. Ct. 1339 (1991).

Page 13 of 16

138 S.W.3d 351, *361; 2004 Tex. Crim. App. LEXIS 1118, **32

The error that we have already found in this case was the trial court's failure to permit further questioning of juror Spradlin concerning any actual bias she might harbor against appellant. The constitutional question, however, is whether appellant's Sixth Amendment right to trial by an impartial jury was violated. If Ms. **[*362]** Spradlin was actually biased against appellant, he did not receive his constitutionally guaranteed right to trial by an impartial jury. But if Ms. Spradlin did not harbor any actual **[**33]** bias against appellant, he did receive a constitutionally fair trial by an impartial jury. Under well-established federal precedent, the defendant must show that the juror had an actual bias against him before he is entitled to relief. I would therefore follow federal precedent and abate this case to the trial court to give appellant the opportunity to call Ms. Spradlin and question her about her relationship with C.N.T. If Ms. Spradlin was actually biased against appellant, he has suffered constitutional harm. If she was not biased, appellant was tried by a fair and impartial jury and he has suffered no harm at all, despite the trial court's error.

I.

During voir dire in this case, the State asked the jury panel if anyone knew C.N.T., the complainant in this aggravated sexual assault of a child trial. No one said they did. Appellant did not inquire further and he did not ask C.N.T. to enter the courtroom or stand up so the jury panel could see her in person. After the jury was empaneled, the State called C.N.T. to the witness stand. As soon as C.N.T. took the witness stand, Juror Spradlin passed a note to the judge stating that she now recognized C.N.T. As we stated in our original **[**34]** opinion in this case:

Apparently, Juror Spradlin had a daughter in the same girl scout troop as C.N.T., and Juror Spradlin was that girl scout troop's assistant leader. She had not recognized the name, but knew C.N.T. when she saw her. The trial court judge asked Juror Spradlin if she could listen to the evidence in the case and base her judgment just on what she heard from the stand. Juror Spradlin stated that she could. [1]

Appellant's counsel immediately moved for a mistrial. The trial judge refused that request, stating: "I think it was obvious from seeing her that she had no idea who this witness was until she saw her come into the courtroom." Appellant then requested an opportunity to question Ms. Spradlin further about her relationship with C.N.T. Again the trial judge refused: "I'm not going to permit that because you had ample opportunity on voir dire." The State argued that appellant had failed to show any harm because **[**35]** there was no indication that Juror Spradlin would be unfair or partial. Appellant objected again, observing that "the reason that there is no evidence of any potential biases, of course, the Court is preventing me from further developing that testimony from that particular juror once that relationship has been established." Appellant's counsel then set out on the record the questions he would have asked Juror Spradlin about her relationship with C.N.T. had he been permitted to do so. These were all appropriate questions and appellant should have been allowed to ask them.

The trial court erred in refusing to allow further inquiry into the juror's potential bias. In our prior opinion, we held that appellant properly preserved this error and remanded the case for the court of appeals to conduct a harm analysis. [2] On remand, the court of appeals held that this was constitutional error because appellant was deprived of his right to "question the members of the jury panel in order to intelligently exercise peremptory challenges." **[*363]** [3] This seems a peculiar conclusion because appellant could have questioned Ms. Spradlin during voir dire until the cows came home, but until Ms. Spradlin saw **[**36]** C.N.T. she would not have realized that she knew her.

---

[1] *Franklin v. State*, 12 S.W.3d 473, 476 (Tex. Crim. App. 2000).

[2] *Id.* at 479.

[3] *Franklin v. State*, 23 S.W.3d 81, 83 (Tex. App.-Texarkana 2000).

Page 14 of 16

138 S.W.3d 351, *363; 2004 Tex. Crim. App. LEXIS 1118, **36

It seems to me that the problem here has nothing to do with voir dire and nothing to do with the exercise of peremptory challenges. Voir dire was over when this problem surfaced. Instead, the issue is whether a biased juror sat on appellant's jury. This scenario and the constitutional issue it presents are very familiar to the federal courts. Therefore, I think that we should follow federal precedent in dealing with this constitutional issue. Under federal precedent, the proper remedy is to remand the case to the trial court for a hearing. [4]

 [**37] II.

The Sixth Amendment guarantees the accused the right to a trial by an impartial jury. [5] This right to trial by an impartial jury lies at the heart of due process. [6] The Constitution provides no specific tests of juror partiality or bias, but the United States Supreme Court has stated that "the bias of a juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law." [7]

Although there are a few exceptional circumstances in which "implied bias" may be presumed as a matter of law, [8] [**39] normally [*364] a party seeking a new trial [**38] (or, as in this case, a mistrial) must show a juror's "actual bias." [9]

To obtain a new trial for actual juror bias, a defendant must show: 1) that a juror failed to answer honestly a material question during voir dire; and 2) that a correct response would have provided the basis for a challenge for cause. [10] [**41] This is the test applied when a juror

---

[7] *United States v. Wood*, 299 U.S. 123, 134, 81 L. Ed. 78, 57 S. Ct. 177 (1936).

[8] *See Smith v. Phillips*, 455 U.S. 209, 222-23, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982) (O'Connor, J., concurring) (noting that "there are some extreme situations that would justify a finding of implied bias," including "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction"); *see also Solis v. Cockrell*, 342 F.3d 392, 395-98 (5th Cir. 2003) (citing cases and analyzing doctrine of "implied" or "presumed" juror bias when juror fails to disclose material information during voir dire; rejecting habeas applicant's claim of implied bias when juror failed to disclose that he lived not more than two blocks from defendant, had known him and his family for more than twenty years, and knew that defendant and his brothers "break into people's homes"). In *Solis*, the Fifth Circuit noted that the Supreme Court has never explicitly upheld a claim of implied bias, although it may have implicitly done so. *Id.* at 395 (discussing *Leonard v. United States*, 378 U.S. 544, 12 L. Ed. 2d 1028, 84 S. Ct. 1696 (1964)).

[9] Appellant's argument suggests that this is an instance of "implied" or "presumed" juror bias. He states: "Except immediate family members, one could hardly imagine a stronger relationship than that which exists between a girl scout and her troop leader." I cannot accept that premise, but even so, the record in this case indicates that Ms. Spradlin did not have a close relationship with C.N.T. because she did not even recognize her name. Appellant provides no legal support for his argument that being a crime victim's assistant girl scout leader raises "implied" or "presumed" bias.

[10] *McDonough*, 464 U.S. at 556; *United States v. Bishop*, 264 F.3d 535, 554 (2001) ("moving party must demonstrate that a juror failed to answer a material voir dire question honestly, and that a correct response would have been a valid basis for a challenge for cause"); *United States v. Wilson*, 116 F.3d 1066, 1086 (5th Cir. 1997) ("generally, to obtain a new trial for jury bias, a party must demonstrate: (1) that a juror failed to answer honestly a material question during *voir dire,* and (2) that a correct response would have provided the basis for a successful challenge for cause"); *Dennis v.*

---

[4] *Smith v. Phillips,* 455 U.S. 209, 215, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982) ("this Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 551-52, 78 L. Ed. 2d 663, 104 S. Ct. 845 & n.3, 464 U.S. 548, 78 L. Ed. 2d 663, 104 S. Ct. 845 (1984) (stating that proper resolution of whether juror's "unrevealed information" during voir dire showed juror bias is to remand case to district court to conduct a hearing to decide that factual question); *Remmer v. United States*, 347 U.S. 227, 230, 98 L. Ed. 654, 74 S. Ct. 450 (1954) (remanding case to district court to determine whether attempted bribery of juror influenced him and made him prejudiced); *Solis v. Cockrell*, 342 F.3d 392, 399 (5th Cir. 2003) (post-conviction hearing conducted by trial court which turned up no prejudice toward defendant by juror protected habeas applicant's right to trial by impartial jury); *Tinsley v. Borg*, 895 F.2d 520, 524-26 (9th Cir. 1990) (citing *Phillips* and noting that post-trial hearing is appropriate mechanism to resolve constitutional claims of juror bias when juror fails to disclose material information during voir dire).

[5] U.S. CONST. amend. VI ("in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury").

[6] *Irvin v. Dowd*, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961) ("the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors").

Page 15 of 16

138 S.W.3d 351, *364; 2004 Tex. Crim. App. LEXIS 1118, **41

*intentionally* conceals information. [11] The Supreme Court explained in *McDonough* that "the motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness [**40] of a trial." [12] Inaccurate responses to voir dire questions are excused when caused by inattention or when a query does not elicit the specific information relevant to the juror's possible disqualification. [13] Even when a juror's failure to disclose information on voir dire is dishonest rather than mistaken, "his behavior is not a basis for reversal unless the dishonesty appears to be rooted in bias or prejudice." [14]

Under the Supreme Court's constitutional standard:

A juror … need not be disqualified merely because he or she knows the defendant or has some knowledge about the case. A defendant must show that the knowledge somehow impaired-or had the ineluctable tendency to impair-the juror's neutrality. That is to say, the defendant must show actual, or at least likely, prejudice stemming from the participation of the allegedly biased juror. [15]

The mere fact that a juror was the former "paramour" of the defendant's son was insufficient to show actual prejudice; [16] the fact that a juror was the friend of the murder victim was insufficient; [**42] [17] [**43] the fact [*365] that one

defendant and a juror had previously had a disagreement over a bill was insufficient; [18] and the fact that a juror, although questioned repeatedly, failed to disclose that she had been previously convicted of theft and sat on a trial involving federal income tax fraud, was insufficient. [19] There are a plethora of federal cases addressing precisely the constitutional issue presented in this case. It seems to me that we should consult those cases before we reverse appellant's conviction on this constitutional basis. As the Supreme Court stated in *McDonough*:

To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have

---

honestly mistaken in her response; nonetheless, mere friendship with victim does not, by itself, constitute juror bias). As the Fifth Circuit noted in *Montoya*:

We have found no published opinion upholding a challenge for cause based on a venireperson's mere acquaintance with the victim of the crime for which the defendant has been charged, and the Texas Court of Criminal Appeals has squarely held that the mere fact that a juror knows the victim is not sufficient basis for disqualification. *See Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982). In *Anderson*, the juror was a school teacher at the school where the rape at issue occurred and knew the victim, who attended the school, and several of the State's witnesses, but did not know the defendant. The court stated: "Although such knowledge [of the victim] may be the source of an existing bias, 'the mere fact that a juror knows, or is a neighbor, or an intimate acquaintance of, and on friendly relations with, one of the parties to a suit, is not sufficient basis for disqualification.'"

65 F.3d at 419-20.

[18] *United States v. Uribe*, 890 F.2d 554, 561 (1st Cir. 1989).

[19] *Bishop*, 264 F.3d at 556 (juror offered a "plausible explanation for her failure to answer the juror questionnaire and voir dire inquiries regarding her criminal history accurately").

---

*Mitchell*, 354 F.3d 511, 520-21 (6th Cir. 2003) (setting out *McDonough* test).

[11] *McDonough*, 464 U.S. at 556; *Dennis v. Mitchell*, 354 F.3d at 520.

[12] *McDonough*, 464 U.S. at 556.

[13] *Bishop*, 264 F.3d at 555.

[14] *Id.*

[15] *Neron v. Tierney*, 841 F.2d 1197, 1206 (1st Cir. 1988).

[16] *Id.* at 1203.

[17] *Wilson*, 116 F.3d at 1086; *see also Montoya v. Scott*, 65 F.3d 405, 420 (5th Cir. 1995) (juror who did not respond to voir dire question of whether she knew victim when in fact she did may have been

Page 16 of 16

138 S.W.3d 351, *365; 2004 Tex. Crim. App. LEXIS 1118, **43

obtained from a juror on *voir dire* examination. [20]

In this case, there is not a scintilla of suggestion **[**44]** that Ms. Spradlin "withheld" any information. Indeed, the moment she saw C.N.T. in person, she immediately informed the trial judge that she did, in fact, recognize the child, though she had not recognized the name. Surely this is a common phenomenon to us all. To guard against this problem, appellant could easily have asked C.N.T. and all of the witnesses to stand up in the courtroom and then ask the venire members if they recognized any of them. This is frequently done in Texas courtrooms. Appellant should not be punished for his failure to perform this simple voir dire exercise, [21] but neither should he obtain a reversal for that failure. As it stands, there is nothing in this record to suggest that Ms. Spradlin was biased against appellant. The problem in this case is that appellant was prevented from **[*366]** even attempting to explore or establish bias.

 **[**45]** Appellant, the court of appeals, and the majority cast this constitutional claim as one involving the right to make intelligent peremptory challenges. But there is no federal constitutional right to peremptory challenges. [22] **[**46]** I believe

that when a defendant relies upon the United States Constitution for his claim, we should address his claim under the United States Constitution and the controlling precedent of the United States Supreme Court. [23]

Furthermore, there are numerous federal cases, including *McDonough* itself, addressing the appropriate remedy when the trial court has not provided an adequate forum to develop the factual basis for the claim of a biased juror. That remedy is to remand the case to the trial court to give the defendant an opportunity to establish his claim of a biased juror. [24] I, like the Supreme Court, believe that a trial represents an important investment of private and social resources, an investment that is the main event, not a try-out on the road to appellate speculation about possible juror bias. **[**47]** Appellant is entitled to show actual bias, but we ought not assume it without support in the record.

I respectfully dissent to the majority's failure to follow federal constitutional law and procedure on appellant's federal constitutional claim.

Cochran, J.

Filed: June 30, 2004.

**End of Document**

---

[20] *McDonough*, 464 U.S. at 555.

[21] *But see Wilson*, 116 F.3d at 1086 (defendant bears burden of proving that the belated discovery of juror's friendship with the victim was not due to lack of diligence on his part); *cf. Neron*, 841 F.2d at 1202 n.6 (noting that allegations of juror bias "which are frivolous--that is, entirely conclusory or conjectural, contradicted by the record, inherently incredible, patently false, or obviously inconsequential--do not trigger any duty of inquiry [by the trial court] and do not require that a hearing be held").

[22] *Georgia v. McCollum*, 505 U.S. 42, 57, 120 L. Ed. 2d 33, 112 S. Ct. 2348 (1992) ("it is important to recall that peremptory challenges are not constitutionally protected fundamental rights; rather, they are but one state -- created means to the constitutional end of an impartial jury and a fair trial. This Court repeatedly has stated that the right to a peremptory challenge may be withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair trial"); *Frazier v. United States*, 335 U.S. 497, 505, 93 L. Ed. 187, 69 S. Ct. 201 (1948) (stating that the right to peremptory challenges "is given in aid of the party's interest to secure a fair and impartial jury, not for creating ground to claim partiality which but

for its exercise would not exist").

[23] In *Jones v. State*, 596 S.W.2d 134 (Tex. Crim. App. 1980), this Court did not address any question of constitutional error or harm because the defendant failed to ask any specific questions designed to elicit the fact that the juror had once been employed as a jail guard. *Id.* at 136. Because the defendant did not show that the juror intentionally withheld material information, he failed to show any "misconduct that would warrant reversal." *Id.* at 137.

[24] *See supra* note 4.

# Packingham v. North Carolina

Supreme Court of the United States

February 27, 2017, Argued; June 19, 2017, Decided

No. 15-1194.

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/26/17 5:56:59 PM

KEITH E. HOTTLE
CLERK

**Reporter**

137 S. Ct. 1730 *; 198 L. Ed. 2d 273 **; 2017 U.S. LEXIS 3871 ***; 85 U.S.L.W. 4353; 26 Fla. L. Weekly Fed. S 695; 66 Comm. Reg. (P & F) 1397; 2017 WL 2621313

LESTER GERARD **_PACKINGHAM_**, Petitioner v. NORTH CAROLINA

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History: [\*\*\*1]** ON WRIT OF CERTIORARI TO THE SUPREME COURT OF NORTH CAROLINA

State v. **_Packingham_**, 368 N.C. 380, 777 S.E.2d 738, 2015 N.C. LEXIS 1061 (Nov. 6, 2015)

**Disposition:** Reversed and remanded.

## Core Terms

websites, users, site, internet, Amazon, networking, com, sex offender, profile, sexual, https, www, media, WebMD, registered sex offender, communicate, abuser, photographs, convicted, exchanges, visitors, html, facilitates, pages, message board, advertising, Electronic, customer, minors, child abuse

## Case Summary

### Overview

HOLDINGS: [1]-N.C. Gen. Stat. § 14-202.5, which made it a felony for registered sex offenders to access commercial social networking websites where a sex offender knew the site allowed minor children to become members or to create or maintain a personal web page, was unconstitutional because it impermissibly restricted lawful speech in violation of the First Amendment's Free Speech Clause, which was applicable to North Carolina under the Due Process Clause of the Fourteenth Amendment.

### Outcome

The Supreme Court reversed the Supreme Court of North Carolina's judgment upholding N.C. Gen. Stat. § 14-202.5 and remanded the case. 8-0 Decision; 1 concurrence.

## LexisNexis® Headnotes

Computer & Internet Law > Content Regulation > First Amendment Protections

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

_HN1_[⬇️] **Content Regulation, First Amendment Protections**

A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The United States Supreme Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights.

Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire. While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the vast democratic forums of the Internet in general, and social media in particular. Social media offers relatively unlimited, low-cost capacity for communication of all kinds, and social media users employ various websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought.

Computer & Internet Law > Content Regulation > First Amendment Protections

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN2*[⬇] **Content Regulation, First Amendment Protections**

The nature of a revolution in thought can be that, in its early stages, even its participants may be unaware of it. And when awareness comes, they still may be unable to know or foresee where its changes lead. While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech

Governments > Legislation > Overbreadth

*HN3*[⬇] **Fundamental Freedoms, Freedom of Speech**

In order to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest. In other words, the law must not burden substantially more speech than is necessary to further the government's legitimate interests.

Criminal Law & Procedure > ... > Sex Crimes > Sexual Assault > Abuse of Children

Governments > Legislation > Overbreadth

*HN4*[⬇] **Sexual Assault, Abuse of Children**

There is no doubt that, as the United States Supreme Court has recognized, the sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people. And it is clear that a legislature may pass valid laws to protect children and other victims of sexual assault from abuse. The government, of course, need not simply stand by and allow these evils to occur. But the assertion of a valid governmental interest cannot, in every context, be insulated from all constitutional protections.

Business & Corporate Compliance > ... > Computer & Internet Law > Content Regulation > State Statutes

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Computer & Internet Law > Content Regulation > First Amendment Protections

*HN5*[⬇] **Content Regulation, State Statutes**

Social media allows users to gain access to

information and communicate with one another about it on any subject that might come to mind. By prohibiting sex offenders from using social media websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. Social media websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to become a town crier with a voice that resonates farther than it could from any soapbox. In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN6*[⬇] **Fundamental Freedoms, Freedom of Speech**

It is well established that, as a general rule, the government may not suppress lawful speech as the means to suppress unlawful speech.

## Lawyers' Edition Display

### Decision

[**273] State statute, which made it felony for anyone on state's registry of sex offenders to access various websites, including Facebook, if sites were known to allow minors to have accounts,

impermissibly restricted lawful speech in violation of Federal Constitution's First Amendment.

### Summary

**Overview:** HOLDINGS: [1]-N.C. Gen. Stat. § 14-202.5, which made it a felony for registered sex offenders to access commercial social networking websites where a sex offender knew the site allowed minor children to become members or to create or maintain a personal web page, was unconstitutional because it impermissibly restricted lawful speech in violation of the First Amendment's Free Speech Clause, which was applicable to North Carolina under the Due Process Clause of the Fourteenth Amendment.

**Outcome:** The Supreme Court reversed the Supreme Court of North Carolina's judgment upholding N.C. Gen. Stat. § 14-202.5 and remanded the case. 8-0 Decision; 1 concurrence.

## Headnotes

[**274]

Constitutional Law 938 > FREE SPEECH -- PUBLIC FORUM -- STREET OR PARK -- SOCIAL MEDIA > Headnote:
*LEdHN1.*[⬇] 1.

A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The United States Supreme Court has sought to protect the right to speak in this spatial context. A basic rule, for example, is that a street or a park is a quintessential forum for the exercise of First Amendment rights. Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire. While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace--the vast

democratic forums of the Internet in general, and social media in particular. Social media offers relatively unlimited, low-cost capacity for communication of all kinds, and social media users employ various websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Constitutional Law 938 > FREE SPEECH -- INTERNET > Headnote:
*LEdHN2.*[⬇] 2.

The nature of a revolution in thought can be that, in its early stages, even its participants may be unaware of it. And when awareness comes, they still may be unable to know or foresee where its changes lead. While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Constitutional Law 935 > SPEECH RESTRICTION -- NARROW TAILORING > Headnote:
*LEdHN3.*[⬇] 3.

In order to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest. In other words, the law must not burden substantially more speech than is necessary to further the government's legitimate interests. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Constitutional Law 961 > FREE SPEECH -- SEXUAL

ABUSE -- PROTECTION OF CHILDREN > Headnote:
*LEdHN4.*[⬇] 4.

There is no doubt that, as the United States Supreme Court has recognized, the sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people. And it is clear that a legislature may pass valid laws to protect children and other victims of sexual assault from abuse. The government, of course, need not simply stand by and allow these evils to occur. But the assertion of a valid governmental interest cannot, in every context, be insulated from all constitutional protections. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**[**275]**

Constitutional Law 961.5 > FREE SPEECH -- SEX OFFENDERS -- SOCIAL MEDIA WEBSITES -- STATE STATUTE > Headnote:
*LEdHN5.*[⬇] 5.

Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind. By prohibiting sex offenders from using social media websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. Social media websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to become a town crier with a voice that resonates farther than it could from any soapbox. In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. Even convicted criminals--and in some instances especially convicted criminals--might receive

legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Constitutional Law 930 > LAWFUL AND UNLAWFUL SPEECH > Headnote: *LEdHN6.*[⬇] 6.

It is well established that, as a general rule, the government may not suppress lawful speech as the means to suppress unlawful speech. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

## Syllabus

[**276] [*1731] North Carolina law makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14-202.5(a), (e). According to sources cited to the Court, the State has prosecuted over 1,000 people for violating this law, including petitioner, who was indicted after posting a statement on his personal Facebook profile about a positive experience in traffic court. The trial court denied petitioner's motion to dismiss the indictment on the ground that the law violated the First Amendment. He was convicted and given a suspended prison sentence. On appeal, the State Court of Appeals struck down §14-202.5 on First Amendment grounds, but the State Supreme Court reversed.

*Held:* The North Carolina statute impermissibly restricts lawful speech in violation of the First Amendment. Pp. ___ - ___, 198 L. Ed. 2d, at 279-283.

[*1732] (a) A fundamental First Amendment principle is that all persons have access to places

where they can speak and listen, and then, after reflection, speak and listen once more. Today, one of the most important places to exchange views is cyberspace, particularly [***2] social media, which offers "relatively unlimited, low-cost capacity for communication of all kinds," *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874, to users engaged in a wide array of protected First Amendment activity on any number of diverse topics. The Internet's forces and directions are so new, so protean, and so far reaching that courts must be conscious that what they say today may be obsolete tomorrow. Here, in one of the first cases the Court has taken to address the relationship between the First Amendment and the modern Internet, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium. Pp. ___ - ___, 198 L. Ed. 2d, at 279-280.

(b) This background informs the analysis of the statute at issue. Even assuming that the statute is content neutral and thus subject to intermediate scrutiny, the provision is not " ' "narrowly tailored to serve a significant governmental interest." ' " *McCullen* v. *Coakley*, 573 U. S. ___, ___, 134 S. Ct. 2518, 189 L. Ed. 2d 502, 514, 520, 535. Like other inventions heralded as advances in human progress, the Internet and social media will be exploited by the criminal mind. It is also clear that "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people," *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 244, 122 S. Ct. 1389, 152 L. Ed. 2d 403, and that a legislature "may pass valid laws to protect children" [***3] and other sexual assault victims, *id.,* at 245, 122 S. Ct. 1389, 152 L. Ed. 2d 403. However, the assertion of a valid governmental interest "cannot, in every context, be insulated from all constitutional protections." *Stanley* v. *Georgia*, 394 U. S. 557, 563, 89 S. Ct. 1243, 22 L. Ed. 2d 542.

Two assumptions are made in resolving this case.

First, while the Court need not decide the statute's [**277] precise scope, it is enough to assume that the law applies to commonplace social networking sites like Facebook, LinkedIn, and Twitter. Second, the Court assumes that the First Amendment permits a State to enact specific, narrowly-tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor.

Even with these assumptions, the statute here enacts a prohibition unprecedented in the scope of First Amendment speech it burdens. Social media allows users to gain access to information and communicate with one another on any subject that might come to mind. With one broad stroke, North Carolina bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. Foreclosing [***4] access to social media altogether thus prevents users from engaging in the legitimate exercise of First Amendment rights. Even convicted criminals--and in some instances especially convicted criminals--might receive legitimate benefits from these means for access to the world of ideas, particularly if they seek to reform and to pursue lawful and rewarding lives. Pp. ___ - ___, 198 L. Ed. 2d, at 280-282.

(c) The State has not met its burden to show that this sweeping law is necessary or legitimate to serve its purpose of keeping convicted sex offenders away from vulnerable victims. No case or holding of [*1733] this Court has approved of a statute as broad in its reach. The State relies on *Burson* v. *Freeman*, 504 U. S. 191, 112 S. Ct. 1846, 119 L. Ed. 2d 5, but that case considered a more limited restriction--prohibiting campaigning within 100 feet of a polling place--in order to protect the fundamental right to vote. The Court noted, moreover, that a larger buffer zone could "become an impermissible burden" under the First Amendment. *Id.,* at 210, 112 S. Ct. 1846, 119 L.

Ed. 2d 5. The better analogy is *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 107 S. Ct. 2568, 96 L. Ed. 2d 500. If an ordinance prohibiting any "First Amendment activities" at a single Los Angeles airport could be struck down because it covered all manner of protected, nondisruptive behavior, including "talking and reading, or the wearing of campaign buttons [***5] or symbolic clothing," *id.,* at 571, 575, 107 S. Ct. 2568, 96 L. Ed. 2d 500, it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on websites integral to the fabric of modern society and culture. Pp. ___ - ___, 198 L. Ed. 2d, at 282-283.

368 N. C. 380, 777 S. E. 2d 738, reversed and remanded.

**Counsel: David T. Goldberg** argued the cause for petitioner.

**Robert C. Montgomery** argued the cause for respondent:

**Judges:** Kennedy, J., delivered the opinion of the Court, in which Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Alito, J., filed an opinion concurring in the judgment, in which Roberts, C. J., and Thomas, J., joined. Gorsuch, J., took no part in the consideration or decision of the case.

**Opinion by:** KENNEDY

## Opinion

[**278] Justice **Kennedy** delivered the opinion of the Court.

In 2008, North Carolina enacted a statute making it a felony for a registered sex offender to gain access to a number of websites, including commonplace social media websites like Facebook and Twitter. The question presented is whether that law is permissible under the First Amendment's Free Speech Clause, applicable to the States under the

Due Process Clause of the Fourteenth Amendment.

I

A

North Carolina law makes it a felony for a registered sex offender "to access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14-202.5(a), (e) (2015). A "commercial social networking Web site" is defined [***6] as a website that meets four criteria. First, it "[i]s operated by a person who derives revenue from membership fees, advertising, or other sources related to the operation of the [*1734] Web site." §14-202.5(b). Second, it "[f]acilitates the social introduction between two or more persons for the purposes of friendship, meeting other persons, or information exchanges." *Ibid.* Third, it "[a]llows users to create Web pages or personal profiles that contain information such as the name or nickname of the user, photographs placed on the personal Web page by the user, other personal information about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site." *Ibid.* And fourth, it "[p]rovides users or visitors . . . mechanisms to communicate with other users, such as a message board, chat room, electronic mail, or instant messenger." *Ibid.*

The statute includes two express exemptions. The statutory bar does not extend to websites that "[p]rovid[e] only one of the following discrete services: photo-sharing, electronic mail, instant messenger, or chat room or message board platform." §14-202.5(c)(1). The law also does not encompass websites [***7] that have as their "primary purpose the facilitation of commercial transactions involving goods or services between [their] members or visitors." §14-202.5(c)(2).

According to sources cited to the Court, §14-202.5 applies to about 20,000 people in North Carolina and the State has prosecuted over 1,000 people for violating it. Brief for Petitioner 6-8.

B

In 2002, petitioner Lester Gerard **Packingham**—then a 21-year-old college student—had sex with a 13-year-old girl. He pleaded guilty to taking indecent liberties with a child. Because this crime qualifies as "an offense against a minor," petitioner was required to register as a sex offender—a status that can endure for 30 years or more. See §14-208.6A; see §14-208.7(a). As a registered sex offender, petitioner was barred under §14-202.5 from gaining access to commercial social networking sites.

In 2010, a state court dismissed a [**279] traffic ticket against petitioner. In response, he logged on to Facebook.com and posted the following statement on his personal profile:

> "Man God is Good! How about I got so much favor they dismissed the ticket before court even started? No fine, no court cost, no nothing spent. . . . . .Praise be to GOD, WOW! Thanks JESUS!" App. 136.

At the time, a member of the Durham [***8] Police Department was investigating registered sex offenders who were thought to be violating §14-202.5. The officer noticed that a "'J. R. Gerrard'" had posted the statement quoted above. 368 N. C. 380, 381, 777 S. E. 2d 738, 742 (2015). By checking court records, the officer discovered that a traffic citation for petitioner had been dismissed around the time of the post. Evidence obtained by search warrant confirmed the officer's suspicions that petitioner was J. R. Gerrard.

Petitioner was indicted by a grand jury for violating §14-202.5. The trial court denied his motion to dismiss the indictment on the grounds that the charge against him violated the First Amendment. Petitioner was ultimately convicted and given a suspended prison sentence. At no point during trial or sentencing did the State allege that petitioner contacted a minor—or committed any other illicit act—on the Internet.

Petitioner appealed to the Court of Appeals of North Carolina. That court struck down §14-202.5 on First Amendment grounds, explaining that the law is not narrowly tailored to serve the State's **[*1735]** legitimate interest in protecting minors from sexual abuse. 229 N. C. App. 293, 304, 748 S. E. 2d 146, 154 (2013). Rather, the law "arbitrarily burdens all registered sex offenders by preventing a wide range of communication and expressive activity unrelated to achieving **[***9]** its purported goal." *Ibid.* The North Carolina Supreme Court reversed, concluding that the law is "constitutional in all respects." 368 N. C., at 381, 777 S. E. 2d, at 741. Among other things, the court explained that the law is "carefully tailored . . . to prohibit registered sex offenders from accessing only those Web sites that allow them the opportunity to gather information about minors." *Id.*, at 389, 777 S. E. 2d, at 747. The court also held that the law leaves open adequate alternative means of communication because it permits petitioner to gain access to websites that the court believed perform the "same or similar" functions as social media, such as the Paula Deen Network and the website for the local NBC affiliate. *Id.*, at 390, 777 S. E. 2d, at 747. Two justices dissented. They stated that the law impermissibly "creates a criminal prohibition of alarming breadth and extends well beyond the evils the State seeks to combat." *Id.*, at 401, 777 S. E. 2d, at 754 (opinion of Hudson, J.) (alteration, citation, and internal quotation marks omitted).

The Court granted certiorari, 580 U. S. ___, 137 S. Ct. 368, 196 L. Ed. 2d 283 (2016), and now reverses.

II

*HN1*[⬆] *LEdHN[1]*[⬆] [1] A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more. The Court has sought to protect the right to speak in this **[***10]** spatial context. A basic rule, for example, is that a **[**280]** street or a park is a quintessential forum for the exercise of First Amendment rights. See *Ward* v. *Rock Against*

*Racism*, 491 U. S. 781, 796, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989). Even in the modern era, these places are still essential venues for public gatherings to celebrate some views, to protest others, or simply to learn and inquire.

While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general, *Reno* v. *American Civil Liberties Union*, 521 U. S. 844, 868, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997), and social media in particular. Seven in ten American adults use at least one Internet social networking service. Brief for Electronic Frontier Foundation et al. as *Amici Curiae* 5-6. One of the most popular of these sites is Facebook, the site used by petitioner leading to his conviction in this case. According to sources cited to the Court in this case, Facebook has 1.79 billion active users. *Id.,* at 6. This is about three times the population of North America.

Social media offers "relatively unlimited, low-cost capacity for communication of all kinds." *Reno*, *supra,* at 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874. On Facebook, for example, users can debate religion and politics with their friends and neighbors or share **[***11]** vacation photos. On LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship. And on Twitter, users can petition their elected representatives and otherwise engage with them in a direct manner. Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose. See Brief for Electronic Frontier Foundation 15-16. In short, social media users employ these websites to engage in a wide array of protected First Amendment **[*1736]** activity on topics "as diverse as human thought." *Reno*, *supra*, at 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (internal quotation marks omitted).

*HN2*[⬆] *LEdHN[2]*[⬆] [2] The nature of a revolution in thought can be that, in its early stages, even its participants may be unaware of it. And

when awareness comes, they still may be unable to know or foresee where its changes lead. Cf. D. Hawke, Benjamin Rush: Revolutionary Gadfly 341 (1971) (quoting Rush as observing: "'The American war is over; but this is far from being the case with the American revolution. On the contrary, nothing but the first act of the great drama is closed'"). So too here. While we now may be coming to the realization that the Cyber Age is a revolution of historic proportions, we cannot appreciate yet its full **[***12]** dimensions and vast potential to alter how we think, express ourselves, and define who we want to be. The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow.

This case is one of the first this Court has taken to address the relationship between the First Amendment and the modern Internet. As a result, the Court must exercise extreme caution before suggesting that the First Amendment provides scant protection for access to vast networks in that medium.

III

This background informs the analysis **[**281]** of the North Carolina statute at issue. Even making the assumption that the statute is content neutral and thus subject to intermediate scrutiny, the provision cannot stand. *HN3*[⬆] *LEdHN[3]*[⬆] [3] In order to survive intermediate scrutiny, a law must be "narrowly tailored to serve a significant governmental interest." *McCullen* v. *Coakley*, 573 U. S. ___, ___, 134 S. Ct. 2518, 189 L. Ed. 2d 502, 520 (2014) (internal quotation marks omitted). In other words, the law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.,* at ___, 134 S. Ct. 2518, 189 L. Ed. 2d 502, 520 (internal quotation marks omitted).

For centuries now, inventions heralded as advances in human progress have been exploited by the criminal mind. New **[***13]** technologies, all too

soon, can become instruments used to commit serious crimes. The railroad is one example, see M. Crichton, The Great Train Robbery, p. xv (1975), and the telephone another, see 18 U. S. C. §1343. So it will be with the Internet and social media.

*HN4*[⬆] *LEdHN[4]*[⬆] [4] There is also no doubt that, as this Court has recognized, "[t]he sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234, 244, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002). And it is clear that a legislature "may pass valid laws to protect children" and other victims of sexual assault "from abuse." See *id.,* at 245; accord, *New York* v. *Ferber*, 458 U. S. 747, 757, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). The government, of course, need not simply stand by and allow these evils to occur. But the assertion of a valid governmental interest "cannot, in every context, be insulated from all constitutional protections." *Stanley* v. *Georgia*, 394 U. S. 557, 563, 89 S. Ct. 1243, 22 L. Ed. 2d 542 (1969).

It is necessary to make two assumptions to resolve this case. First, given the broad wording of the North Carolina statute at issue, it might well bar access not only to commonplace social media websites but also to websites as varied as Amazon.com, Washingtonpost.com, and Webmd.com. See *post,* at ___ - ___, 198 L. Ed. 2d, at 286-288; see also Brief for Electronic Frontier Foundation **[*1737]** 24-27; Brief for Cato Institute et al. as *Amici Curiae* 10-12, **[***14]** and n. 6. The Court need not decide the precise scope of the statute. It is enough to assume that the law applies (as the State concedes it does) to social networking sites "as commonly understood"—that is, websites like Facebook, LinkedIn, and Twitter. See Brief for Respondent 54; Tr. of Oral Arg. 27.

Second, this opinion should not be interpreted as barring a State from enacting more specific laws than the one at issue. Specific criminal acts are not protected speech even if speech is the means for their commission. See *Brandenburg* v. *Ohio*, 395

U. S. 444, 447-449, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969) ( *per curiam*). Though the issue is not before the Court, it can be assumed that the First Amendment permits a State to enact specific, narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor. Cf. Brief for Respondent 42-43. Specific laws of that type must be the State's first resort to ward off the serious harm that sexual crimes inflict. **[**282]** (Of importance, the troubling fact that the law imposes severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system is also **[***15]** not an issue before the Court.)

Even with these assumptions about the scope of the law and the State's interest, the statute here enacts a prohibition unprecedented in the scope of First Amendment speech it burdens. *HN5*[⬆] *LEdHN[5]*[⬆] [5] Social media allows users to gain access to information and communicate with one another about it on any subject that might come to mind. *Supra,* at ___, 198 L. Ed. 2d, at 280. By prohibiting sex offenders from using those websites, North Carolina with one broad stroke bars access to what for many are the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge. These websites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard. They allow a person with an Internet connection to "become a town crier with a voice that resonates farther than it could from any soapbox." *Reno*, 521 U. S., at 870, 117 S. Ct. 2329, 138 L. Ed. 2d 874.

In sum, to foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights. It is unsettling to suggest that only a limited set of websites can be used even by persons who have completed their sentences. **[***16]** Even convicted criminals—and in some instances especially convicted criminals—might receive legitimate benefits from these means for access to the world of ideas, in particular if they seek to reform and to pursue lawful and rewarding lives.

IV

The primary response from the State is that the law must be this broad to serve its preventative purpose of keeping convicted sex offenders away from vulnerable victims. The State has not, however, met its burden to show that this sweeping law is necessary or legitimate to serve that purpose. See *McCullen*, 573 U. S., at ___, 134 S. Ct. 2518, 189 L. Ed. 2d 502, 525.

It is instructive that no case or holding of this Court has approved of a statute as broad in its reach. The closest analogy that the State has cited is *Burson* v. *Freeman*, 504 U. S. 191, 112 S. Ct. 1846, 119 L. Ed. 2d 5 (1992). There, the Court upheld a prohibition on campaigning within **[*1738]** 100 feet of a polling place. That case gives little or no support to the State. The law in *Burson* was a limited restriction that, in a context consistent with constitutional tradition, was enacted to protect another fundamental right—the right to vote. The restrictions there were far less onerous than those the State seeks to impose here. The law in *Burson* meant only that the last few seconds before voters entered a polling place were "their **[***17]** own, as free from interference as possible." *Id.,* at 210, 112 S. Ct. 1846, 119 L. Ed. 2d 5. And the Court noted that, were the buffer zone larger than 100 feet, it "could effectively become an impermissible burden" under the First Amendment. *Ibid.*

The better analogy to this case is *Board of Airport Comm'rs of Los Angeles* **[**283]** v. *Jews for Jesus, Inc.*, 482 U. S. 569, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (1987), where the Court struck down an ordinance prohibiting any "First Amendment activities" at Los Angeles International Airport because the ordinance covered all manner of protected, nondisruptive behavior including "talking and reading, or the wearing of campaign

buttons or symbolic clothing," *id.,* at 571, 575, 107 S. Ct. 2568, 96 L. Ed. 2d 500. If a law prohibiting "all protected expression" at a single airport is not constitutional, *id.*, at 574, 107 S. Ct. 2568, 96 L. Ed. 2d 500 (emphasis deleted), it follows with even greater force that the State may not enact this complete bar to the exercise of First Amendment rights on websites integral to the fabric of our modern society and culture.

\*\*\*

*HN6*[⬆] *LEdHN[6]*[⬆] [6] It is well established that, as a general rule, the Government "may not suppress lawful speech as the means to suppress unlawful speech." *Ashcroft* v. *Free Speech Coalition*, 535 U. S., at 255, 122 S. Ct. 1389, 152 L. Ed. 2d 403. That is what North Carolina has done here. Its law must be held invalid.

The judgment of the North Carolina Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered. [***18]

Justice Gorsuch took no part in the consideration or decision of this case.

**Concur by:** ALITO

# Concur

Justice **Alito**, with whom The Chief Justice and Justice **Thomas** join, concurring in the judgment.

The North Carolina statute at issue in this case was enacted to serve an interest of "surpassing importance." *New York* v. *Ferber*, 458 U. S. 747, 757, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982)—but it has a staggering reach. It makes it a felony for a registered sex offender simply to visit a vast array of websites, including many that appear to provide no realistic opportunity for communications that could facilitate the abuse of children. Because of the law's extraordinary breadth, I agree with the Court that it violates the Free Speech Clause of the

First Amendment.

I cannot join the opinion of the Court, however, because of its undisciplined dicta. The Court is unable to resist musings that seem to equate the entirety of the internet with public streets and parks. *Ante*, at ___ - ___, 198 L. Ed. 2d, at 279-280. And this language is bound to be interpreted by some to mean that the States are largely powerless to restrict even the most dangerous sexual predators from visiting any internet sites, including, for example, teenage dating sites and sites designed to permit minors to discuss personal problems with their peers. I am troubled by the implications of the Court's [***19] unnecessary rhetoric.

I

A

The North Carolina law at issue makes it a felony for a registered sex offender "to [*1739] access a commercial social networking Web site where the sex offender knows that the site permits minor children to become members [**284] or to create or maintain personal Web pages." N. C. Gen. Stat. Ann. §§14-202.5(a), (e) (2015). And as I will explain, the statutory definition of a "commercial social networking Web site" is very broad.

*Packingham* and the State debate the analytical framework that governs this case. The State argues that the law in question is content neutral and merely regulates a "place" (*i.e.*, the internet) where convicted sex offenders may wish to engage in speech. See Brief for Respondent 20-25. Therefore, according to the State, the standard applicable to "time, place, or manner" restrictions should apply. See *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989). *Packingham* responds that the challenged statute is "unlike any law this Court has considered as a time, place, or manner restriction," Brief for Petitioner 37, and he advocates a more demanding standard of review, *id.*, at 37-39.

Like the Court, I find it unnecessary to resolve this dispute because the law in question cannot satisfy

the standard applicable to a content-neutral regulation of the place **[***20]** where speech may occur.

B

A content-neutral "time, place, or manner" restriction must serve a "legitimate" government interest, *Ward*, *supra*, at 798, 109 S. Ct. 2746, 105 L. Ed. 2d 661, and the North Carolina law easily satisfies this requirement. As we have frequently noted, "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, *supra*, at 757, 102 S. Ct. 3348, 73 L. Ed. 2d 1113. "Sex offenders are a serious threat," and "the victims of sexual assault are most often juveniles." *McKune* v. *Lile*, 536 U. S. 24, 32, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002) (plurality opinion); see *Connecticut Dept. of Public Safety* v. *Doe*, 538 U. S. 1, 4, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003). "[T]he . . . interest [of] safeguarding the physical and psychological well-being of a minor . . . is a compelling one," *Globe Newspaper Co.* v. *Superior Court, County of Norfolk*, 457 U. S. 596, 607, 102 S. Ct. 2613, 73 L. Ed. 2d 248 (1982), and "we have sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights," *Ferber*, *supra*, at 757, 102 S. Ct. 3348, 73 L. Ed. 2d 1113.

Repeat sex offenders pose an especially grave risk to children. "When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune*, *supra*, at 33, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (plurality opinion); see *United States* v. *Kebodeaux*, 570 U. S. ___, ___-___, 133 S. Ct. 2496, 186 L. Ed. 2d 540, 549 (2013).

The State's interest in protecting children from recidivist sex offenders plainly applies to internet use. Several factors make **[***21]** the internet a powerful tool for the would-be child abuser. First, children often use the internet in a way that gives offenders easy access to their personal information—by, for example, communicating with strangers and allowing sites to **[**285]** disclose their location. [1] Second, the internet provides previously unavailable ways **[*1740]** of communicating with, stalking, and ultimately abusing children. An abuser can create a false profile that misrepresents the abuser's age and gender. The abuser can lure the minor into engaging in sexual conversations, sending explicit photos, or even meeting in person. And an abuser can use a child's location posts on the internet to determine the pattern of the child's day-to-day activities—and even the child's location at a given moment. Such uses of the internet are already well documented, both in research [2] and in reported decisions. [3]

---

[1] See Pew Research Center, Teens, Social Media, and Privacy 5 (May 21, 2013), http://www.pewinternet.org/files/2013/05/PIP_TeensSocialMediaandPrivacy_PDF.pdf (all internet materials as last visited June 16, 2017); J. Wolak, K. Mitchell, & D. Finkelhor, National Center for Missing & Exploited Children, Online Victimization of Youth: Five Years Later 7 (2006) (prepared by Univ. of N. H., Crimes Against Children Research Center), http://www.unh.edu/ccrc/pdf/CV138.pdf.

[2] See *id.*, at 2-3; Wolak, Finkhor, Mitchell, & Ybarra, Online "Predators" and Their Victims, 63 Am. Psychologist 111, 112 (Feb.-Mar. 2008).

[3] For example, in *State* v. *Gallo*, 275 Ore. App. 868, 869, 365 P. 3d 1154, 1154-1155 (2015), a 32-year-old defendant posing as a 15-year-old boy used a social networking site to contact and befriend a 16-year-old autistic girl. "He then arranged to meet the victim, took her to a park, and sexually abused her." *Ibid.*, 365 P. 3d, at 1155. In *United States* v. Steele, 664 Fed. Appx. 260, 261 (CA3 2016), the defendant "began interacting with a minor [victim] on the gay social networking cell phone application 'Jack'd.'" He eventually met the 14-year-old victim and sexually abused him. *Ibid.* Sadly, these cases are not unique. See, *e.g.*, *Himko* v. *English*, 2016 U.S. Dist. LEXIS 180814, 2016 WL 7645584, *1 (ND Fla., Dec. 5, 2016) (a convicted rapist and registered sex offender "contacted a sixteen-year-old girl using . . . Facebook" and then exchanged explicit text messages and photographs with her), report and recommendation adopted, 2017 U.S. Dist. LEXIS 1016, 2017 WL 54246 (Jan. 4, 2017); *Roberts* v. *United States*, 2015 U.S. Dist. LEXIS 158012, 2015 WL 7424858, *2-*3 (SD Ohio, Nov. 23, 2015) (the defendant "met a then 14-year-old child online via a social networking website called vampirefreaks.com" and then enticed the child to his home and "coerced the child to perform oral sex on him"), report and recommendation adopted, 2016 U.S. Dist. LEXIS 2503, 2016 WL

Because protecting children from abuse is a compelling state interest and sex offenders can (and do) use the internet to engage in such abuse, it is legitimate and entirely reasonable for States to try to stop abuse from occurring before it happens.

C

1

It is not enough, **[***22]** however, that the law before us is designed to serve a compelling state interest; it also must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U. S., at 798-799, 109 S. Ct. 2746, 105 L. Ed. 2d 661; see also *McCullen* v. *Coakley*, 573 U. S. ___, ___-___, 134 S. Ct. 2518, 189 L. Ed. 2d 502, 514, 520, 535 (2014)). The North Carolina law fails this requirement.

A straightforward reading of the text of N. C. Gen. Stat. Ann. §14-202.5 compels the conclusion that it prohibits sex offenders from accessing an enormous number of websites. The law defines a "commercial social networking **[**286]** Web site" as one with four characteristics. First, the website must be "operated by a person who derives revenue from membership fees, advertising, or other sources related to the operation of the Web site." §14-202.5(b)(1). Due to the prevalence of advertising on websites of all types, this requirement does little to limit the statute's reach.

Second, the website must "[f]acilitat[e] the social introduction between two or **[*1741]** more persons for the purposes of friendship, meeting other persons, or information exchanges." §14-202.5(b)(2). The term "social introduction" easily encompasses any casual exchange, and the term "information exchanges" seems to apply to any site that provides an opportunity for a visitor to post a statement or comment that may be read by other visitors. Today, **[***23]** a great many websites include this feature.

Third, a website must "[a]llo[w] users to create Web pages or personal profiles that contain information *such as* the name or nickname of the user, photographs placed on the personal Web page by the user, other personal information about the user, and links to other personal Web pages on the commercial social networking Web site of friends or associates of the user that may be accessed by other users or visitors to the Web site." §14-202.5(b)(3) (emphasis added). This definition covers websites that allow users to create anything that can be called a "personal profile," *i.e.*, a short description of the user. [4] Contrary to the argument of the State, Brief for Respondent 26-27, everything that follows the phrase "such as" is an illustration of features that a covered website or personal profile may (but need not) include.

Fourth, in order to fit within the statute, a website must "[p]rovid[e] users or visitors . . . mechanisms to communicate with other users, *such as* a message board, chat room, electronic mail, or instant messenger." §14-202.5(b)(4) (emphasis added). This requirement seems to demand no more than that a website allow back-and-forth comments between users. And since a comment **[***24]** function is undoubtedly a "mechanis[m] to communicate with other users," *ibid.*, it appears to follow that any website with such a function satisfies this requirement.

2

The fatal problem for §14-202.5 is that its wide sweep precludes access to a large number of websites that are most unlikely to facilitate the commission of a sex crime against a child. A handful of examples illustrates this point.

Take, for example, the popular retail website

---

112647 (Jan. 8, 2016), certificate of appealability denied, No. 16-3050 (CA6 June 15, 2016); *State* v. *Murphy*, 2016-0901, p. 3 (La. App. 1 Cir. 10/28/16), 206 So. 3d 219, 224 (a defendant "initiated conversations" with his 12-year-old victim "on a social network chat site called 'Kik'" and later sent sexually graphic photographs of himself to the victim and received sexually graphic photos from her).

[4] See New Oxford American Dictionary 1394 (3d ed. 2010); Webster's Third New International Dictionary 1811 (2002); 12 Oxford English Dictionary 576 (2d ed. 1989).

Amazon.com, which allows minors to use its services [5] and meets all four requirements of §14-202.5's definition of a commercial social networking website. First, as a seller of products, Amazon unquestionably derives revenue from the operation of its website. Second, the Amazon site facilitates the social introduction of people for the purpose of information exchanges. When someone [**287] purchases a product on Amazon, the purchaser can review the product and upload photographs, and other buyers can then respond to the review. [6] This information exchange about products that Amazon sells undoubtedly fits within the definition in §14-202.5. It is the equivalent of passengers on a bus comparing notes about products they have purchased. Third, Amazon allows a user to create a personal profile, which [***25] is then associated with the product reviews that [*1742] the user uploads. Such a profile can contain an assortment of information, including the user's name, e-mail address, and picture. [7] And fourth, given its back-and-forth comment function, Amazon satisfies the final statutory requirement. [8]

Many news websites are also covered by this definition. For example, the Washington Post's website gives minors access [9] and satisfies the four elements that define a commercial social networking website. The website (1) derives revenue from ads and (2) facilitates social introductions for the purpose of information exchanges. Users of the site can comment on articles, reply to other users' comments, and recommend another user's comment. [10] Users can also (3) create personal profiles that include a name or nickname and a photograph. The photograph and name will then appear next to every comment the user leaves on an article. Finally (4), the back-and-forth comment section is a mechanism for users to communicate among themselves. The site thus falls within §14-202.5 and is accordingly off limits for registered sex offenders in North Carolina.

Or consider WebMD—a website that contains health-related resources, [***26] from tools that help users find a doctor to information on preventative care and the symptoms associated with particular medical problems. WebMD, too, allows children on the site. [11] And it exhibits the four hallmarks of a "commercial social networking" website. It obtains revenue [**288] from advertisements. [12] It facilitates information exchanges—via message boards that allow users to engage in public discussion of an assortment of

---

[5] See Amazon, Conditions of Use (June 21, 2016), https://www.amazon. com / gp / help /customer/display.html/ref=help_search_1-2?ie=UTF8& nodeId=201909000&qid=1490898710&sr=1-2.

[6] See Amazon, About Customer Reviews, https://www.amazon.com/ gp/help/customer/display.html/ref =hp_left_v4_sib?ie=UTF8&nodeId= 201967050; Amazon, About Public Activity, https://www.amazon.com/ gp/ help/ customer/ display.html / ref = hp_left_v4_sib?ie = UTF8&nodeId = 202076150.

[7] See Amazon, About Your Profile, https://www.amazon.com/ gp/help/customer/display.html/ref =hp_left_v4_sib?ie=UTF8&nodeId= 202076210; Amazon, About Public Information, https://www.amazon.com/ gp/help/customer/display.html/ref =help_search_1-2?ie =UTF8&nodeId = 202076170&qid=1490835739&sr=1-2.

[8] Amazon does not appear to fall within the statute's exemption for websites that have as their "primary purpose the facilitation of commercial transactions involving goods or services between its members or visitors." §14-202.5(c)(2). Amazon's primary purpose seems to be the facilitation of commercial transactions between its users and *itself.*

[9] See Washington Post, Terms of Service (July 1, 2014), https://www. washingtonpost.com/terms-of-service/2011/11/18/gIQAldiYiN_story.html? utm_term=.9be5851f95.

[10] See Washington Post, Ad choices (Nov. 21, 2011), https://www. washingtonpost.com/ how -can -i- opt-out-of-online-advertising-cookies / 2011 / 11/18/gIQABECbiN_story.html?utm_term=3da1f56d67e7; Washington Post, Privacy Policy (May 2, 2017), https://www.washingtonpost.com/ privacy-policy / 2011 / 11 / 18 / gIQASIiaiN _ story.html ? utm_term = .8252a76f8df2.

[11] See WebMD, Terms and Conditions of Use (Nov. 2, 2016), https://www. webmd.com/about-webmd-policies/about-terms-and-conditions-of-use.

[12] WebMD, Advertising Policy (June 9, 2016), http://www.webmd.com/ about-webmd-policies/about-advertising-policy.

health issues. [13] It allows users to create basic profile pages: Users can upload a picture and some basic information about themselves, and other users can see their aggregated comments and "likes." [14] WebMD also provides message boards, which are specifically mentioned in the statute as a "mechanis[m] to communicate with other users." N. C. Gen. Stat. Ann. §14-202.5(b)(4).

As these examples illustrate, the North Carolina law has a very broad reach and **[*1743]** covers websites that are ill suited for use in stalking or abusing children. The focus of the discussion on these sites—shopping, news, health—does not provide a convenient jumping off point for conversations that may lead to abuse. In addition, the social exchanges facilitated by these websites occur in the open, and this reduces **[***27]** the possibility of a child being secretly lured into an abusive situation. These websites also give sex offenders little opportunity to gather personal details about a child; the information that can be listed in a profile is limited, and the profiles are brief. What is more, none of these websites make it easy to determine a child's precise location at a given moment. For example, they do not permit photo streams (at most, a child could upload a single profile photograph), and they do not include up-to-the minute location services. Such websites would provide essentially no aid to a would-be child abuser.

Placing this set of websites categorically off limits from registered sex offenders prohibits them from receiving or engaging in speech that the First Amendment protects and does not appreciably advance the State's goal of protecting children from recidivist sex offenders. I am therefore compelled to conclude that, while the law before us addresses a critical problem, it sweeps far too broadly to satisfy the demands of the Free Speech Clause. [15]

## II

While I thus agree with the Court that the particular law at issue in this case violates the First Amendment, I am troubled by the Court's loose rhetoric. After noting that "a street or **[***28]** a park is a quintessential forum for the exercise of First Amendment rights," the Court states that "cyberspace" and "social media in particular" are now "the most important places (in a spatial sense) for the exchange of views." *Ante*, at ___ - ___, 198 L. Ed. 2d, at 279-280. The Court declines to explain what this means with respect to free speech law, and the Court holds no more than that the North Carolina law fails the test for content-neutral "time, place, **[**289]** and manner" restrictions. But if the entirety of the internet or even just "social media" sites [16] are the 21st century equivalent of public streets and parks, then States may have little ability to restrict the sites that may be visited by even the most dangerous sex offenders. May a State preclude an adult previously convicted of molesting children from visiting a dating site for teenagers? Or a site where minors communicate with each other about personal problems? The Court should be more attentive to the implications of its rhetoric for, contrary to the Court's suggestion, there are important differences between cyberspace and the physical world.

I will mention a few that are relevant to internet use by sex offenders. First, it is easier for parents to monitor the physical **[***29]** locations that their children visit and the individuals with whom they speak in person than it is to monitor their internet use. Second, if a sex offender is seen approaching children or loitering in a place frequented by children, this conduct may be observed by parents, teachers, or others. Third, the internet offers an unprecedented degree of anonymity and easily

---

[13] WebMD, Message Board Overview (Sept. 22, 2016), http://www.webmd.com/about-webmd-policies/about-community-overview.

[14] See WebMD, Change Your Profile Settings (Feb. 19, 2014), http://www.webmd.com/about-webmd-policies/profile.

[15] I express no view on whether a law that does not reach the sort of sites discussed above would satisfy the First Amendment. Until such a law is before us, it is premature to address that question.

[16] As the law at issue here shows, it is not easy to provide a precise definition of a "social media" site, and the Court makes no effort to do so. Thus, the scope of its dicta is obscure.

permits **[\*1744]** a would-be molester to assume a false identity.

The Court is correct that we should be cautious in applying our free speech precedents to the internet. *Ante*, at ___, 198 L. Ed. 2d, at 280. Cyberspace is different from the physical world, and if it is true, as the Court believes, that "we cannot appreciate yet" the "full dimensions and vast potential" of "the Cyber Age," *ibid.*, we should proceed circumspectly, taking one step at a time. It is regrettable that the Court has not heeded its own admonition of caution.

## References

U.S.C.S., Constitution, Amendment 1

The Prosecution and Defense of Sex Crimes § 43.04 (Matthew Bender)

L Ed Digest, Constitutional Law § 961.5

L Ed Index, Children and Minors

Supreme Court's views as to overbreadth of legislation in connection with First Amendment rights. 45 L. Ed. 2d 725.

Comment Note.--What provisions of the Federal Constitution's Bill of Rights are applicable to the states. 18 L. Ed. 2d 1388, 23 L. Ed. 2d 985.

The Supreme Court and the right of free speech **[\*\*\*30]** and press. 93 L. Ed. 1151, 2 L. Ed. 2d 1706, 11 L. Ed. 2d 1116, 16 L. Ed. 2d 1053, 21 L. Ed. 2d 976.


# Pena-Rodriguez v. Colorado

Supreme Court of the United States

October 11, 2016, Argued; March 6, 2017, Decided

No. 15-606.

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/26/17 5:56:59 PM

KEITH E. HOTTLE
CLERK

**Reporter**

137 S. Ct. 855 *; 197 L. Ed. 2d 107 **; 2017 U.S. LEXIS 1574 ***; 85 U.S.L.W. 4071; 102 Fed. R. Evid. Serv. (Callaghan) 1084; 26 Fla. L. Weekly Fed. S 445; 2017 WL 855760

MIGUEL ANGEL PENA-RODRIGUEZ, Petitioner v. COLORADO

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History: [***1]** ON WRIT OF CERTIORARI TO THE SUPREME COURT OF COLORADO

Pena-Rodriguez v. People, 350 P.3d 287, 2015 Colo. LEXIS 440, 2015 CO 31 (2015)

**Disposition:** 350 P. 3d 287, 2015 CO 31, reversed and remanded.

## Core Terms

juror, racial bias, no-impeachment, deliberations, cases, bias, voir dire, jury's, impeach, impartiality, questions, jurisdictions, harassment, safeguards, biased, jury room, misconduct, decisions, rules of evidence, jury deliberations, juror misconduct, jury system, common law, courts, right to a jury trial, trial court, approaches, common-law, extraneous, partiality

## Case Summary

### Overview

HOLDINGS: [1]-Colorado courts erred when they found that a jury's verdict convicting defendant of harassment and unlawful sexual contact could not be reviewed under Colo. R. Evid. 606(b), even though a juror told other jurors he believed defendant was guilty because, in his experience as a former law enforcement officer, "Mexican men had a bravado that caused them to believe they could do whatever they wanted with women"; [2]-Although Colo. R. Evid. 606(b) restricted inquiry into the validity of a jury's verdict, the Sixth Amendment to the U.S. Constitution required that the so-called "no-impeachment rule" give way in order to permit a trial court to consider evidence of a juror's statement and any resulting denial of the jury trial guarantee in cases where a juror made a clear statement which indicated that he or she relied on racial stereotypes or animus to convict a defendant.

### Outcome

The Supreme Court reversed the Supreme Court of Colorado's judgment upholding defendant's convictions and remanded the case for further proceedings. 5-3 Decision; 2 Dissents.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

*HN1*[⬇] **Criminal Process, Right to Jury Trial**

The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

*HN2*[⬇] **Criminal Process, Right to Jury Trial**

In the era of our Nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty. The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment. U.S. Const. art. III, § 2, cl. 3; amend. VI. By operation of the Fourteenth Amendment, it is applicable to the States.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Privacy of Deliberations

Criminal Law & Procedure > Trials > Defendant's

Rights > Right to Jury Trial

*HN3*[⬇] **Criminal Process, Right to Jury Trial**

Like all human institutions, the jury system has its flaws, yet experience shows that fair and impartial verdicts can be reached if the jury follows the court's instructions and undertakes deliberations that are honest, candid, robust, and based on common sense. A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the "no-impeachment rule."

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Privacy of Deliberations

*HN4*[⬇] **Jury Deliberations, Privacy of Deliberations**

Like its federal counterpart, Colo. R. Evid. 606(b) generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict. Fed. R. Evid. 606(b). The Colorado rule provides that upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict

onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying. Colo. R. Evid. 606(b).

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Privacy of Deliberations

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

## HN5[⬇] Criminal Process, Right to Jury Trial

The United States Supreme Court's recognition in Warger v. Shauers that there may be extreme cases where the jury trial right requires an exception to the no-impeachment rule must be interpreted in context as a guarded, cautious statement. This caution is warranted to avoid formulating an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect.

Constitutional Law > Equal Protection > National Origin & Race

## HN6[⬇] Equal Protection, National Origin & Race

It must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons. This imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments. The central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States.

Constitutional Law > Equal Protection > National Origin & Race

Criminal Law & Procedure > ... > Challenges to Jury Venire > Equal Protection Challenges > Equal Protection Rule

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Fair Trial

## HN7[⬇] Equal Protection, National Origin & Race

The duty to confront racial animus in the justice system is not the legislature's alone. Time and again, the United States Supreme Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system. Beginning in 1880, the Court interpreted the Fourteenth Amendment to prohibit the exclusion of jurors on the basis of race, and the Court has repeatedly struck down laws and practices that systematically exclude racial minorities from juries. To guard against discrimination in jury selection, the Court has ruled that no litigant may exclude a prospective juror on the basis of race. In an effort to ensure that individuals who sit on juries are free of racial bias, the Court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during voir dire. The unmistakable principle underlying these precedents is that discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. The jury is to be a

criminal defendant's fundamental protection of life and liberty against race or color prejudice. Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the state.

Constitutional Law > Equal Protection > National Origin & Race

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Ability to Follow Instructions

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Privacy of Deliberations

*HN8*[⤓] **Equal Protection, National Origin & Race**

Racial bias in a criminal trial differs in critical ways from the compromise verdict in McDonald v. Pless, the drug and alcohol abuse in Tanner v. United States, or the pro-defendant bias in Warger v. Shauers. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury—or juror—gone off course. Jurors are presumed to follow their oath, and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. To attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny. It is not at all clear that the jury system could survive such efforts to perfect it. The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of

justice. The United States Supreme Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy. Racial bias is distinct in a pragmatic sense as well.

Constitutional Law > Equal Protection > National Origin & Race

Criminal Law & Procedure > ... > Challenges to Jury Venire > Equal Protection Challenges > Equal Protection Rule

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Fair Trial

*HN9*[⤓] **Equal Protection, National Origin & Race**

In past cases, the United States Supreme Court has relied on procedural safeguards to protect the right to an impartial jury. Some of those safeguards, to be sure, can disclose racial bias. Voir dire at the outset of trial, observation of juror demeanor and conduct during trial, juror reports before the verdict, and nonjuror evidence after trial are important mechanisms for discovering bias. Yet their operation may be compromised, or they may prove insufficient. The recognition that certain of the safeguards the Court identified in Tanner v. United States may be less effective in rooting out racial bias than other kinds of bias is not

dispositive. All forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right.

Constitutional Law > Equal Protection > National Origin & Race

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Privacy of Deliberations

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Fair Trial

*HN10*[⬇] **Equal Protection, National Origin & Race**

Where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee. Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations

and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence. The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors.

Constitutional Law > Equal Protection > National Origin & Race

Criminal Law & Procedure > Juries & Jurors > Jury Deliberations > Privacy of Deliberations

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Jury Trial

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Fair Trial

*HN11*[⬇] **Equal Protection, National Origin & Race**

The Nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the United States Supreme Court's insistence that blatant racial prejudice is antithetical to the functioning of the jury system and must be confronted in egregious cases despite the general bar of the no-impeachment rule. It is the mark of a maturing legal system that it seeks to understand and to implement

the lessons of history.

## Lawyers' Edition Display

### Decision
[**107]

Where juror made clear statement indicating that juror relied on racial stereotypes or animus to convict accused, Federal Constitution's Sixth Amendment required no-impeachment rule to give way to permit trial court to consider evidence of juror's statement and any resulting denial of Sixth Amendment's jury-trial guarantee.

### Summary

[**108] **Overview:** HOLDINGS: [1]-Colorado courts erred when they found that a jury's verdict convicting defendant of harassment and unlawful sexual contact could not be reviewed under Colo. R. Evid. 606(b), even though a juror told other jurors he believed defendant was guilty because, in his experience as a former law enforcement officer, "Mexican men had a bravado that caused them to believe they could do whatever they wanted with women"; [2]-Although Colo. R. Evid. 606(b) restricted inquiry into the validity of a jury's verdict, the Sixth Amendment to the U.S. Constitution required that the so-called "no-impeachment rule" give way in order to permit a trial court to consider evidence of a juror's statement and any resulting denial of the jury trial guarantee in cases where a juror made a clear statement which indicated that he or she relied on racial stereotypes or animus to convict a defendant.

**Outcome:** The Supreme Court reversed the Supreme Court of Colorado's judgment upholding defendant's convictions and remanded the case for further proceedings. 5-3 Decision; 2 Dissents.

## Headnotes

Jury 1 > JUSTICE SYSTEM -- GUILT OR INNOCENCE > Headnote:
*LEdHN1*[⬇] 1

The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Constitutional Law 38Jury 3 > JURY TRIAL -- COMMON LAW -- STATES > Headnote:
*LEdHN2*[⬇] 2

In the era of our nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty. The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment. U.S. Const. Art. III, § 2, cl. 3; Amend. VI. By operation of the Fourteenth Amendment, it is applicable to the states. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Trial 342 > VERDICT -- IMPEACHMENT > Headnote:
*LEdHN3*[⬇] 3

Like all human institutions, the jury system has its flaws, yet experience shows that fair and impartial verdicts can be reached if the jury follows the court's instructions and undertakes deliberations

that are honest, candid, robust, and based on common sense. A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the "no-impeachment rule." (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

**[**109]**

Trial 351 > JUROR TESTIMONY CONCERNING DELIBERATIONS -- STATE EVIDENTIARY RULE > Headnote:
*LEdHN4*[⬇]  4

Like its federal counterpart, Colo. R. Evid. 606(b) generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict. Fed. R. Evid. 606(b). The Colorado rule provides that upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any  juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying. Colo. R. Evid. 606(b). (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Trial 351 > NO-IMPEACHMENT RULE > Headnote:
*LEdHN5*[⬇]  5

The United States Supreme Court's recognition in Warger v. Shauers that there may be extreme cases where the jury trial right requires an exception to the no-impeachment rule must be interpreted in context as a guarded, cautious statement. This caution is warranted to avoid formulating an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Civil Rights 2 > FOURTEENTH AMENDMENT -- RACIAL DISCRIMINATION > Headnote:
*LEdHN6*[⬇]  6

It must become the heritage of our nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons. This imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments. The central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the states. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Civil Rights 8Civil Rights 8.5 > JURY -- RACIAL DISCRIMINATION -- VOIR DIRE > Headnote:
*LEdHN7*[⬇]  7

The duty to confront racial animus in the justice system is not the legislature's alone. Time and again, the United States Supreme Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system. Beginning in 1880, the court interpreted the Fourteenth Amendment to prohibit the exclusion of jurors on the basis of race, and the court has repeatedly struck down laws and practices that systematically exclude racial minorities from juries. To guard against discrimination in jury selection, the court has ruled that no litigant may

exclude a prospective juror on the basis of race. In an effort to insure that individuals who sit on juries are free of racial bias, the court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during voir dire. The unmistakable principle underlying these precedents is that discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. The jury is to be a criminal defendant's fundamental protection of life and liberty against race or color prejudice. Permitting racial prejudice in the jury system damages both the fact and the perception of the jury's role as a vital check against the wrongful exercise of power by the state. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

 [**110]

Civil Rights 8 > JURORS -- RACIAL BIAS > Headnote:
*LEdHN8*[↓]  8

Racial bias in a criminal trial differs in critical ways from the compromise verdict in McDonald v. Pless, the drug and alcohol abuse in Tanner v. United States, or the pro-defendant  bias in Warger v. Shauers. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury--or juror--gone off course. Jurors are presumed to follow their oath, and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. To attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny. It is not at all clear that the jury system could survive such efforts to perfect it. The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice. The United States Supreme Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system

remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy. Racial bias is distinct in a pragmatic sense as well. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Trial 343 > JUROR -- RACIAL BIAS -- ADDRESSING ISSUE AFTER VERDICT > Headnote:
*LEdHN9*[↓]  9

In past cases, the United States Supreme Court has relied on procedural safeguards to protect the right to an impartial jury. Some of those safeguards, to be sure, can disclose racial bias. Voir dire at the outset of trial, observation of juror demeanor and conduct during trial, juror reports before the verdict, and nonjuror evidence after trial are important mechanisms for discovering bias. Yet their operation may be compromised, or they may prove insufficient. The recognition that certain of the safeguards the Court identified in Tanner v. United States may be less effective in rooting out racial bias than other kinds of bias is not dispositive. All forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed--including, in some instances, after the verdict has been entered--is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

 [**111]

Trial 351 > JURY VERDICT -- NO-IMPEACHMENT BAR -- TESTIMONY AS TO RACIAL BIAS > Headnote:
*LEdHN10*[↓]  10

Where a juror makes a clear statement that indicates he or she relied on racial stereotypes or

animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee. Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence. The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

Trial 351 > JURY VERDICT -- NO-IMPEACHMENT BAR -- TESTIMONY AS TO RACIAL BIAS > Headnote:
*LEdHN11*[⬇] 11

The nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the United States Supreme Court's insistence that blatant racial prejudice is antithetical to the functioning of the jury system and must be confronted in egregious cases despite the general bar of the no-impeachment rule. It is the mark of a maturing legal system that it seeks to understand and to implement the lessons of history. (Kennedy, J., joined by Ginsburg, Breyer, Sotomayor, and Kagan, JJ.)

## Syllabus

**[\*\*112] [\*857]** A Colorado jury convicted petitioner Pea-Rodriguez of harassment and unlawful sexual contact. Following the discharge of the jury, two jurors told defense counsel that, during deliberations, Juror H. C. had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness. Counsel, with the trial court's supervision, obtained affidavits from the two jurors describing a number of biased statements by H. C. The court acknowledged H. C.'s apparent bias but denied petitioner's motion for a new trial on the ground that Colorado Rule of Evidence 606(b) generally prohibits a juror from testifying as to statements made during deliberations in a proceeding inquiring into the validity of the verdict. The Colorado Court of Appeals affirmed, agreeing that H. C.'s alleged statements did not fall within an exception to Rule 606(b). The Colorado Supreme Court also affirmed, relying on *Tanner* v. *United States*, 483 U. S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90, and *Warger* v. *Shauers*, 574 U. S. ___, 135 S. Ct. 521, 190 L. Ed. 2d 422, both of which rejected constitutional challenges to the federal no-impeachment **[\*858]** rule as applied to evidence of juror misconduct or bias.

*Held:* Where a juror makes a clear statement indicating that he or she relied on racial stereotypes **[\*\*\*2]** or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee. Pp. ___ - ___, 197 L. Ed. 2d, at 118-127.

(a) At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony. Some American jurisdictions adopted a more flexible version of the no-impeachment bar, known as the "Iowa rule," which prevented jurors from testifying only about their own subjective beliefs, thoughts, or motives during deliberations. An alternative approach, later referred to as the

federal approach, permitted an exception only for events extraneous to the deliberative process. This Court's early decisions did not establish a clear preference for a particular version of the no-impeachment rule, appearing open to the Iowa rule in *United States* v. *Reid*, 53 U.S. 361, 12 How. 361, 13 L. Ed. 1023, and *Mattox* v. *United States*, 146 U. S. 140, 13 S. Ct. 50, 36 L. Ed. 917, but [**113] rejecting that approach in *McDonald* v. *Pless*, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300.

The common-law development of the rule reached a milestone in 1975 when Congress adopted Federal Rule of Evidence 606(b), which sets out a broad no-impeachment rule, with only limited exceptions. This version of the no-impeachment rule has substantial merit, promoting full and vigorous discussion by jurors [***3] and providing considerable assurance that after being discharged they will not be summoned to recount their deliberations or otherwise harassed. The rule gives stability and finality to verdicts. Pp. ___ - ___, 197 L. Ed. 2d, at 118-120.

(b) Some version of the no-impeachment rule is followed in every State and the District of Columbia, most of which follow the Federal Rule. At least 16 jurisdictions have recognized an exception for juror testimony about racial bias in deliberations. Three Federal Courts of Appeals have also held or suggested there is a constitutional exception for evidence of racial bias.

In addressing the common-law no-impeachment rule, this Court noted the possibility of an exception in the "gravest and most important cases." *United States* v. *Reid*, *supra,* at 366, 12 How. 361, 13 L. Ed. 1023; *McDonald* v. *Pless*, *supra,* at 269, 35 S. Ct. 783, 59 L. Ed. 1300. The Court has addressed the question whether the Constitution mandates an exception to Rule 606(b) just twice, rejecting an exception each time. In *Tanner,* where the evidence showed that some jurors were under the influence of drugs and alcohol during the trial, the Court identified "long-recognized and very substantial concerns" supporting the no-impeachment rule. 483

U. S., at 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90. The Court also outlined existing, significant safeguards for the defendant's [***4] right to an impartial and competent jury beyond post-trial juror testimony: members of the venire can be examined for impartiality during *voir dire*; juror misconduct may be observed the court, counsel, and court personnel during the trial; and jurors themselves can report misconduct to the court before a verdict is rendered. In *Warger*, a civil case where the evidence indicated that the jury forewoman failed to disclose a prodefendant bias during *voir dire*, the Court again put substantial reliance on existing safeguards for a fair trial. But the Court also warned, as in *Reid* and *McDonald,* that the no-impeachment rule may admit of exceptions for "juror bias so extreme that, almost by definition, the jury trial right has been abridged." [*859] U. S., at ___-___, n. 3, 135 S Ct. 521, 529, 190 L. Ed. 422, 432. *Reid*, *McDonald*, and *Warger* left open the question here: whether the Constitution requires an exception to the no-impeachment rule when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt. Pp. ___ - ___, 197 L. Ed. 2d, at 120-122.

(c) The imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments. "[T]he central purpose of the Fourteenth Amendment was to eliminate racial [***5] discrimination emanating from official sources in the States." *McLaughlin* v. *Florida*, 379 U. S. 184, 192, 85 S. Ct. 283, 13 L. Ed. 2d 222. Time and again, this Court [**114] has enforced the Constitution's guarantee against state-sponsored racial discrimination in the jury system. The Court has interpreted the Fourteenth Amendment to prohibit the exclusion of jurors based on race, *Strauder* v. *West Virginia*, 100 U. S. 303, 305-309, 25 L. Ed. 664; struck down laws and practices that systematically exclude racial minorities from juries, see, *e.g.,Neal* v. *Delaware*, 103 U. S. 370, 26 L. Ed. 567; ruled that no litigant may exclude a prospective juror based on race, see, *e.g., Batson* v. *Kentucky*, 476 U. S. 79, 106 S. Ct.

1712, 90 L. Ed. 2d 69; and held that defendants may at times be entitled to ask about racial bias during *voir dire,* see, *e.g., Ham* v. *South Carolina*, 409 U. S. 524, 93 S. Ct. 848, 35 L. Ed. 2d 46. The unmistakable principle of these precedents is that discrimination on the basis of race, "odious in all aspects, is especially pernicious in the administration of justice," *Rose* v. *Mitchell*, 443 U. S. 545, 555, 99 S. Ct. 2993, 61 L. Ed. 2d 739, damaging "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State," *Powers* v. *Ohio*, 499 U. S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411. Pp. ___ - ___, 197 L. Ed. 2d, at 122-123.

(d) This case lies at the intersection of the Court's decisions endorsing the no-impeachment rule and those seeking to eliminate racial bias in the jury system. Those lines of precedent need not conflict. Racial bias, unlike the behavior in *McDonald*, *Tanner*, or *Warger,* implicates unique historical, [***6] constitutional, and institutional concerns and, if left unaddressed, would risk systemic injury to the administration of justice. It is also distinct in a pragmatic sense, for the *Tanner* safeguards may be less effective in rooting out racial bias. But while all forms of improper bias pose challenges to the trial process, there is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in the justice system must be addressed--including, in some instances, after a verdict has been entered--is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right. Pp. ___ - ___, 197 L. Ed. 2d, at 123-125.

(e) Before the no-impeachment bar can be set aside to allow further judicial inquiry, there must be a threshold showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether the threshold showing has been satisfied is committed to the substantial discretion of the [***7] trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of [*860] professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors. The experience of those jurisdictions that have already recognized a racial-bias exception to the no-impeachment rule, and the experience of courts going forward, will inform the proper exercise of trial judge discretion. The Court need not ad- [**115] dress what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias or the appropriate standard for determining when such evidence is sufficient to require that the verdict be set aside and a new trial be granted. Standard and existing safeguards may also help prevent racial bias in jury deliberations, including careful *voir dire* and a trial court's instructions to jurors about their duty to review the evidence, deliberate together, and reach a verdict in a fair and impartial way, free from bias of any kind. [***8] Pp. ___ - ___, 197 L. Ed. 2d, at 125-127.

350 P. 3d 287, 2015 CO 31, reversed and remanded.

**Counsel: Jeffrey L. Fisher argued the cause for petitioner.**

**Frederick R. Yarger** argued the cause for respondent.

**Rachel P. Kovner** argued the cause for the United States, as amicus curiae, by special leave of court.

**Judges:** Kennedy, J., delivered the opinion of the Court, in which Ginsburg, Breyer, Sotomayor, and Kagan, JJ., joined. Thomas, J., filed a dissenting opinion. Alito, J., filed a dissenting opinion, in which Roberts, C. J., and Thomas, J., joined.

**Opinion by:** Kennedy

# Opinion

Justice **Kennedy** delivered the opinion of the Court.

*HN1*[⬆] *LEdHN[1]*[⬆] [1] The jury is a central foundation of our justice system and our democracy. Whatever its imperfections in a particular case, the jury is a necessary check on governmental power. The jury, over the centuries, has been an inspired, trusted, and effective instrument for resolving factual disputes and determining ultimate questions of guilt or innocence in criminal cases. Over the long course its judgments find acceptance in the community, an acceptance essential to respect for the rule of law. The jury is a tangible implementation of the principle that the law comes from the people.

*HN2*[⬆] *LEdHN[2]*[⬆] [2] In the era of our Nation's founding, the right to a jury trial already had existed and evolved for centuries, through and alongside the common law. The jury was considered a fundamental safeguard of individual liberty. See The Federalist No. 83, p. 451 (B. Warner ed. 1818) (A. Hamilton). **[***9]** The right to a jury trial in criminal cases was part of the Constitution as first drawn, and it was restated in the Sixth Amendment. Art. III, §2, cl. 3; Amdt. 6. **[*861]** By operation of the Fourteenth Amendment, it is applicable to the States. *Duncan* v. *Louisiana*, 391 U. S. 145, 149-150, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

*HN3*[⬆] *LEdHN[3]*[⬆] [3] Like all human institutions, the jury system has its flaws, yet experience shows that fair and impartial verdicts can be reached if the jury follows the court's instructions and undertakes deliberations that are honest, candid, robust, and based on common sense. A general rule has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations. This principle, itself centuries old, is often referred to as the no-impeachment rule. The instant case presents the question whether there is an exception to the no-impeachment rule when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus **[**116]** was a significant motivating factor in his or her vote to convict.

I

State prosecutors in Colorado brought criminal charges against petitioner, Miguel **[***10]** Angel Peña-Rodriguez, based on the following allegations. In 2007, in the bathroom of a Colorado horse-racing facility, a man sexually assaulted two teenage sisters. The girls told their father and identified the man as an employee of the racetrack. The police located and arrested petitioner. Each girl separately identified petitioner as the man who had assaulted her.

The State charged petitioner with harassment, unlawful sexual contact, and attempted sexual assault on a child. Before the jury was empaneled, members of the venire were repeatedly asked whether they believed that they could be fair and impartial in the case. A written questionnaire asked if there was "anything about you that you feel would make it difficult for you to be a fair juror." App. 14. The court repeated the question to the panel of prospective jurors and encouraged jurors to speak in private with the court if they had any concerns about their impartiality. Defense counsel likewise asked whether anyone felt that "this is simply not a good case" for them to be a fair juror. *Id.,* at 34. None of the empaneled jurors expressed any reservations based on racial or any other bias. And none asked to speak with the trial judge. **[***11]**

After a 3-day trial, the jury found petitioner guilty of unlawful sexual contact and harassment, but it failed to reach a verdict on the attempted sexual

assault charge. When the jury was discharged, the court gave them this instruction, as mandated by Colorado law:

> "The question may arise whether you may now discuss this case with the lawyers, defendant, or other persons. For your guidance the court instructs you that whether you talk to anyone is entirely your own decision. . . . If any person persists in discussing the case over your objection, or becomes critical of your service either before or after any discussion has begun, please report it to me." *Id.,* at 85-86.

Following the discharge of the jury, petitioner's counsel entered the jury room to discuss the trial with the jurors. As the room was emptying, two jurors remained to speak with counsel in private. They stated that, during deliberations, another juror had expressed anti-Hispanic bias toward petitioner and petitioner's alibi witness. Petitioner's counsel reported this to the court and, with the court's supervision, obtained sworn affidavits from the two jurors.

 **[*862]** The affidavits by the two jurors described a number of biased statements **[***12]** made by another juror, identified as Juror H. C. According to the two jurors, H. C. told the other jurors that he "believed the defendant was guilty because, in [H. C.'s] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." *Id.*, at 110. The jurors reported that H. C. stated his belief that Mexican men are physically controlling of women because of their sense of entitlement, and further stated, "'I think he did it because he's Mexican and Mexican men take whatever they **[**117]** want.'" *Id.,* at 109. According to the jurors, H. C. further explained that, in his experience, "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." *Id.,* at 110. Finally, the jurors recounted that Juror H. C. said that he did not find petitioner's alibi witness credible because, among other things, the witness

was "'an illegal.'" *Ibid.* (In fact, the witness testified during trial that he was a legal resident of the United States.)

After reviewing the affidavits, the trial court acknowledged H. C.'s apparent bias. But the court denied petitioner's motion for a new trial, noting that "[t]he actual deliberations **[***13]** that occur among the jurors are protected from inquiry under [Colorado Rule of Evidence] 606(b)." *Id.*, at 90. *HN4*[↑] *LEdHN[4]*[↑] [4] Like its federal counterpart, Colorado's Rule 606(b) generally prohibits a juror from testifying as to any statement made during deliberations in a proceeding inquiring into the validity of the verdict. See Fed. Rule Evid. 606(b). The Colorado Rule reads as follows:

> "(b) Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jurors' attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying." **[***14]** Colo. Rule Evid. 606(b) (2016).

The verdict deemed final, petitioner was sentenced to two years' probation and was required to register as a sex offender. A divided panel of the Colorado Court of Appeals affirmed petitioner's conviction, agreeing that H. C.'s alleged statements did not fall within an exception to Rule 606(b) and so were inadmissible to undermine the validity of the verdict. ___ P. 3d ___, 2012 COA 193, 2012 WL

5457362.

The Colorado Supreme Court affirmed by a vote of 4 to 3. 350 P. 3d 287, 2015 CO 31 (2015). The prevailing opinion relied on two decisions of this Court rejecting constitutional challenges to the federal no-impeachment rule as applied to evidence of juror misconduct or bias. See *Tanner* v. *United States*, 483 U. S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987); *Warger* v. *Shauers*, U. S. ___, 135 S. Ct. 521, 190 L. Ed. 2d 422 (2014). After reviewing those precedents, the court could find no "dividing line between different *types* of juror bias or misconduct," and thus no basis for permitting impeachment of the verdicts in petitioner's trial, notwithstanding H. C.'s apparent racial bias. 350 P. 3d, at 293. This Court **[*863]** granted certiorari to decide whether there is a constitutional exception to the no-impeachment rule for instances of racial bias. 578 U. S. ___, 136 S. Ct. 1513, 194 L. Ed. 2d 602 (2016).

Juror H. C.'s bias was based on petitioner's Hispanic identity, which **[**118]** the Court in prior cases has referred to as ethnicity, and that may be an instructive term here. **[***15]** See, *e.g., Hernandez* v. *New York*, 500 U. S. 352, 355, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion). Yet we have also used the language of race when discussing the relevant constitutional principles in cases involving Hispanic persons. See, *e.g., ibid.*; *Fisher* v. *University of Tex. at Austin*, 570 U. S. ___, 133 S. Ct. 2411, 186 L. Ed. 2d 474 (2013); *Rosales-Lopez* v. *United States*, 451 U. S. 182, 189-190, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion). Petitioner and respondent both refer to race, or to race and ethnicity, in this more expansive sense in their briefs to the Court. This opinion refers to the nature of the bias as racial in keeping with the primary terminology employed by the parties and used in our precedents.

## II

## A

At common law jurors were forbidden to impeach their verdict, either by affidavit or live testimony. This rule originated in *Vaise* v. *Delaval*, 1 T. R. 11, 99 Eng. Rep. 944 (K. B. 1785). There, Lord Mansfield excluded juror testimony that the jury had decided the case through a game of chance. The Mansfield rule, as it came to be known, prohibited jurors, after the verdict was entered, from testifying either about their subjective mental processes or about objective events that occurred during deliberations.

American courts adopted the Mansfield rule as a matter of common law, though not in every detail. Some jurisdictions adopted a different, more flexible version of the no-impeachment bar known as the "Iowa rule." Under that rule, **[***16]** jurors were prevented only from testifying about their own subjective beliefs, thoughts, or motives during deliberations. See *Wright* v. *Illinois & Miss. Tel. Co.*, 20 Iowa 195 (1866). Jurors could, however, testify about objective facts and events occurring during deliberations, in part because other jurors could corroborate that testimony.

An alternative approach, later referred to as the federal approach, stayed closer to the original Mansfield rule. See *Warger*, *supra*, at ___, 135 S. Ct. 521, 190 L. Ed. 2d 422 . Under this version of the rule, the no-impeachment bar permitted an exception only for testimony about events extraneous to the deliberative process, such as reliance on outside evidence—newspapers, dictionaries, and the like—or personal investigation of the facts.

This Court's early decisions did not establish a clear preference for a particular version of the no-impeachment rule. In *United States* v. *Reid*, 53 U.S. 361, 12 How. 361, 13 L. Ed. 1023 (1852), the Court appeared open to the admission of juror testimony that the jurors had consulted newspapers during deliberations, but in the end it barred the evidence because the newspapers "had not the slightest influence" on the verdict. *Id.,* at 366, 12 How. 361, 13 L. Ed. 1023. The *Reid* Court warned that juror testimony "ought always to be received with great

caution." *Ibid.* Yet it added an important admonition: "cases might arise in which [***17] it would be impossible to refuse" juror testimony "without violating the plainest principles of justice." *Ibid.*

In a following case the Court required the admission of juror affidavits stating that the jury consulted [**119] information that [*864] was not in evidence, including a prejudicial newspaper article. *Mattox* v. *United States*, 146 U. S. 140, 151, 13 S. Ct. 50, 36 L. Ed. 917 (1892). The Court suggested, furthermore, that the admission of juror testimony might be governed by a more flexible rule, one permitting jury testimony even where it did not involve consultation of prejudicial extraneous information. *Id.,* at 148-149, 13 S. Ct. 50, 36 L. Ed. 917; see also *Hyde* v. *United States*, 225 U. S. 347, 382-384, 32 S. Ct. 793, 56 L. Ed. 1114 (1912) (stating that the more flexible Iowa rule "should apply," but excluding evidence that the jury reached the verdict by trading certain defendants' acquittals for others' convictions).

Later, however, the Court rejected the more lenient Iowa rule. In *McDonald* v. *Pless*, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300 (1915), the Court affirmed the exclusion of juror testimony about objective events in the jury room. There, the jury allegedly had calculated a damages award by averaging the numerical submissions of each member. *Id.,* at 265-266, 35 S. Ct. 783, 59 L. Ed. 1300. As the Court explained, admitting that evidence would have "dangerous consequences": "no verdict would be safe" and the practice would "open the door to the most pernicious arts and tampering with [***18] jurors." *Id.*, at 268, 35 S. Ct. 783, 59 L. Ed. 1300 (internal quotation marks omitted). Yet the Court reiterated its admonition from *Reid*, again cautioning that the no-impeachment rule might recognize exceptions "in the gravest and most important cases" where exclusion of juror affidavits might well violate "the plainest principles of justice." 238 U. S., at 269, 35 S. Ct. 783, 59 L. Ed. 1300 (quoting *Reid*, *supra*, at 366, 12 How. 361, 13 L. Ed. 1023; internal

quotation marks omitted).

The common-law development of the no-impeachment rule reached a milestone in 1975, when Congress adopted the Federal Rules of Evidence, including Rule 606(b). Congress, like the *McDonald* Court, rejected the Iowa rule. Instead it endorsed a broad no-impeachment rule, with only limited exceptions.

The version of the rule that Congress adopted was "no accident." *Warger*, U. S., at ___, 135 S. Ct. 521, 527, 190 L. Ed. 2d 422, 430. The Advisory Committee at first drafted a rule reflecting the Iowa approach, prohibiting admission of juror testimony only as it related to jurors' mental processes in reaching a verdict. The Department of Justice, however, expressed concern over the preliminary rule. The Advisory Committee then drafted the more stringent version now in effect, prohibiting all juror testimony, with exceptions only where the jury had considered prejudicial extraneous evidence or was subject to other [***19] outside influence. Rules of Evidence for United States Courts and Magistrates, 56 F. R. D. 183, 265 (1972). The Court adopted this second version and transmitted it to Congress.

The House favored the Iowa approach, but the Senate expressed concern that it did not sufficiently address the public policy interest in the finality of verdicts. S. Rep. No. 93-1277, pp. 13-14 (1974). Siding with the Senate, the Conference Committee adopted, Congress enacted, and the President signed the Court's proposed rule. The substance of the Rule has not changed since 1975, except for [**120] a 2006 modification permitting evidence of a clerical mistake on the verdict form. See 574 U. S., at ___, 135 S. Ct. 521, 190 L. Ed. 2d 422.

The current version of Rule 606(b) states as follows:

"(1) *Prohibited Testimony or Other Evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during

the jury's deliberations; the effect of anything on that juror's or another juror's [*865] vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

"(2) *Exceptions.* A juror may testify about whether:

"(A) extraneous prejudicial information was improperly brought to the jury's attention; [***20]

"(B) an outside influence was improperly brought to bear on any juror; or

"(C) a mistake was made in entering the verdict on the verdict form."

This version of the no-impeachment rule has substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts.

B

Some version of the no-impeachment rule is followed in every State and the District of Columbia. Variations make classification imprecise, but, as a general matter, it appears that 42 jurisdictions follow the Federal Rule, while 9 follow the Iowa Rule. Within both classifications there is a diversity of approaches. Nine jurisdictions that follow the Federal Rule have codified exceptions other than those listed in Federal Rule 606(b). See Appendix, *infra*. At least 16 jurisdictions, 11 of which follow the Federal Rule, have recognized an exception to the no-impeachment bar under the circumstances the Court faces here: juror testimony that racial bias played a part in deliberations. [***21] *Ibid.* According to the parties and *amici*, only one State other than Colorado has addressed this issue and declined to

recognize an exception for racial bias. See *Commonwealth* v. *Steele*, 599 Pa. 341, 377-379, 961 A. 2d 786, 807-808 (2012).

The federal courts, for their part, are governed by Federal Rule 606(b), but their interpretations deserve further comment. Various Courts of Appeals have had occasion to consider a racial bias exception and have reached different conclusions. Three have held or suggested there is a constitutional exception for evidence of racial bias. See *United States* v. *Villar*, 586 F. 3d 76, 87-88 (CA1 2009) (holding the Constitution demands a racial-bias exception); *United States* v. *Henley*, 238 F. 3d 1111, 1119-1121 (CA9 2001) (finding persuasive arguments in favor of an exception but not deciding the issue); *Shillcutt* v. *Gagnon*, 827 F. 2d 1155, 1158-1160 (CA7 1987) (observing that in some cases fundamental fairness could require an exception). One Court of Appeals has declined to find an exception, reasoning that other safeguards inherent [**121] in the trial process suffice to protect defendants' constitutional interests. See *United States* v. *Benally*, 546 F. 3d 1230, 1240-1241 (CA10 2008). Another has suggested as much, holding in the habeas context that an exception for racial bias was not clearly established but indicating in dicta that no such exception exists. See *Williams* v. *Price*, 343 F. 3d 223, 237-239 (CA3 2003) (Alito, J.). And one Court of Appeals has held that evidence of racial bias is excluded by Rule 606(b), without addressing whether [***22] the Constitution may at times demand an exception. See *Martinez* v. *Food City, Inc.*, 658 F. 2d 369, 373-374 (CA5 1981).

C

In addressing the scope of the common-law no-impeachment rule before Rule 606(b)'s adoption, the *Reid* and *McDonald* Courts noted the possibility of an exception to the rule in the "gravest and most [*866] important cases." *Reid*, 12 How., at 366, 12 How. 361, 13 L. Ed. 1023; *McDonald*, 238 U. S., at 269, 35 S. Ct. 783, 59 L. Ed. 1300. Yet since the enactment of Rule 606(b), the Court has addressed the precise question whether the

Constitution mandates an exception to it in just two instances.

In its first case, *Tanner*, 483 U. S. 107, 107 S. Ct. 2739, 97 L. Ed. 2d 90, the Court rejected a Sixth Amendment exception for evidence that some jurors were under the influence of drugs and alcohol during the trial. *Id.*, at 125, 107 S. Ct. 2739, 97 L. Ed. 2d 90. Central to the Court's reasoning were the "long-recognized and very substantial concerns" supporting "the protection of jury deliberations from intrusive inquiry." *Id.,* at 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90. The *Tanner* Court echoed *McDonald*'s concern that, if attorneys could use juror testimony to attack verdicts, jurors would be "harassed and beset by the defeated party," thus destroying "all frankness and freedom of discussion and conference." 483 U. S., at 120, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (quoting *McDonald*, *supra*, at 267-268, 35 S. Ct. 783, 59 L. Ed. 1300). The Court was concerned, moreover, that attempts to impeach a verdict would "disrupt the finality of the process" and undermine both "jurors' willingness to return an unpopular verdict" and "the [***23] community's trust in a system that relies on the decisions of laypeople." 483 U. S., at 120-121, 107 S. Ct. 2739, 97 L. Ed. 2d 90.

The *Tanner* Court outlined existing, significant safeguards for the defendant's right to an impartial and competent jury beyond post-trial juror testimony. At the outset of the trial process, *voir dire* provides an opportunity for the court and counsel to examine members of the venire for impartiality. As a trial proceeds, the court, counsel, and court personnel have some opportunity to learn of any juror misconduct. And, before the verdict, jurors themselves can report misconduct to the court. These procedures do not undermine the stability of a verdict once rendered. Even after the trial, evidence of misconduct other than juror testimony can be used to attempt to impeach the verdict. *Id.,* at 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90. Balancing these interests and safeguards against the defendant's Sixth Amendment interest in that case, the Court affirmed the exclusion of affidavits pertaining to the jury's inebriated state. *Ibid.*

The second case to consider the general issue presented here was [**122] *Warger*, 574 U. S. ___, 135 S. Ct. 521, 190 L. Ed. 2d 422. The Court again rejected the argument that, in the circumstances there, the jury trial right required an exception to the no-impeachment rule. *Warger* involved a civil case where, [***24] after the verdict was entered, the losing party sought to proffer evidence that the jury forewoman had failed to disclose prodefendant bias during *voir dire*. As in *Tanner*, the Court put substantial reliance on existing safeguards for a fair trial. The Court stated: "Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." 574 U. S., at ___, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422, 432 .

In *Warger*, however, the Court did reiterate that the no-impeachment rule may admit exceptions. As in *Reid* and *McDonald*, the Court warned of "juror bias so extreme that, almost by definition, the jury trial right has been abridged." 574 U. S., at ___-___, n. 3, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422, 432. "If and when such a case arises," the Court indicated it would "consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Ibid.*

*HN5*[⬆] *LEdHN[5]*[⬆] [5] The recognition in *Warger* that there may be extreme cases where the jury trial [*867] right requires an exception to the no-impeachment rule must be interpreted in context as a guarded, cautious statement. This caution is warranted to avoid formulating [***25] an exception that might undermine the jury dynamics and finality interests the no-impeachment rule seeks to protect. Today, however, the Court faces the question that *Reid*, *McDonald*, and *Warger* left open. The Court must decide whether the Constitution requires an exception to the no-impeachment rule when a juror's statements

indicate that racial animus was a significant motivating factor in his or her finding of guilt.

III

*HN6*[⬆] *LEdHN[6]*[⬆] [6] It must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons. This imperative to purge racial prejudice from the administration of justice was given new force and direction by the ratification of the Civil War Amendments.

"[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin* v. *Florida*, 379 U. S. 184, 192, 85 S. Ct. 283, 13 L. Ed. 2d 222 (1964). In the years before and after the ratification of the Fourteenth Amendment, it became clear that racial discrimination in the jury system posed a particular threat both to the promise of the Amendment and to the integrity of the jury trial. "Almost immediately after the Civil War, the South began a practice that would continue for many decades: All-white juries punished black defendants **[***26]** particularly harshly, while simultaneously refusing to punish violence by whites, including Ku Klux Klan members, against blacks and Republicans." Forman, Juries and Race in the Nineteenth Century, 113 Yale L. J. 895, 909-910 (2004). To take one example, just in the years 1865 and 1866, all-white juries in Texas decided a total of 500 prosecutions of white **[**123]** defendants charged with killing African-Americans. All 500 were acquitted. *Id.,* at 916. The stark and unapologetic nature of race-motivated outcomes challenged the American belief that "the jury was a bulwark of liberty," *id.,* at 909, and prompted Congress to pass legislation to integrate the jury system and to bar persons from eligibility for jury service if they had conspired to deny the civil rights of African-Americans, *id.,* at 920-930. Members of Congress stressed that the legislation was necessary to preserve the right to a fair trial and to guarantee the equal protection of the laws. *Ibid.*

*HN7*[⬆] *LEdHN[7]*[⬆] [7] The duty to confront racial animus in the justice system is not the legislature's alone. Time and again, this Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system. Beginning in 1880, the Court interpreted the Fourteenth Amendment to prohibit the exclusion **[***27]** of jurors on the basis of race. *Strauder* v. *West Virginia*, 100 U. S. 303, 305-309, 25 L. Ed. 664 (1880). The Court has repeatedly struck down laws and practices that systematically exclude racial minorities from juries. See, *e.g., Neal* v. *Delaware*, 103 U. S. 370, 26 L. Ed. 567 (1881); *Hollins* v. *Oklahoma*, 295 U. S. 394, 55 S. Ct. 784, 79 L. Ed. 1500 (1935) (*per curiam*); *Avery* v. *Georgia*, 345 U. S. 559, 73 S. Ct. 891, 97 L. Ed. 1244 (1953); *Hernandez* v. *Texas*, 347 U. S. 475, 74 S. Ct. 667, 98 L. Ed. 866 (1954); *Castaneda* v. *Partida*, 430 U. S. 482, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977). To guard against discrimination in jury selection, the Court has ruled that no litigant may exclude a prospective juror on the basis of race. *Batson* v. *Kentucky*, 476 U. S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); **[*868]** *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 111 S. Ct. 2077, 114 L. Ed. 2d 660 (1991); *Georgia* v. *McCollum*, 505 U. S. 42, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992). In an effort to ensure that individuals who sit on juries are free of racial bias, the Court has held that the Constitution at times demands that defendants be permitted to ask questions about racial bias during *voir dire*. *Ham* v. *South Carolina*, 409 U. S. 524, 93 S. Ct. 848, 35 L. Ed. 2d 46 (1973); *Rosales-Lopez*, 451 U. S. 182, 101 S. Ct. 1629, 68 L. Ed. 2d 22; *Turner* v. *Murray*, 476 U. S. 28, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986).

The unmistakable principle underlying these precedents is that discrimination on the basis of race, "odious in all aspects, is especially pernicious in the administration of justice." *Rose* v. *Mitchell*, 443 U. S. 545, 555, 99 S. Ct. 2993, 61 L. Ed. 2d 739 (1979). The jury is to be "a criminal defendant's fundamental 'protection of life and liberty against race or color prejudice.'" *McCleskey*

v. *Kemp*, 481 U. S. 279, 310, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987) (quoting *Strauder*, *supra*, at 309, 25 L. Ed. 664). Permitting racial prejudice in the jury system damages "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State." *Powers* v. *Ohio*, 499 U. S. 400, 411, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991); cf. *Aldridge* v. *United States*, 283 U. S. 308, 315, 51 S. Ct. 470, 75 L. Ed. 1054 (1931); *Buck v. Davis*, *ante*, at ___, 137 S. Ct. 759, 197 L. Ed. 2d 1.

 **[**124]** IV

A

This case lies at the intersection of the Court's decisions endorsing the no-impeachment rule and its decisions seeking **[***28]** to eliminate racial bias in the jury system. The two lines of precedent, however, need not conflict.

*HN8*[⬆] *LEdHN[8]*[⬆] [8] Racial bias of the kind alleged in this case differs in critical ways from the compromise verdict in *McDonald*, the drug and alcohol abuse in *Tanner*, or the pro-defendant bias in *Warger*. The behavior in those cases is troubling and unacceptable, but each involved anomalous behavior from a single jury—or juror—gone off course. Jurors are presumed to follow their oath, cf. *Penry* v. *Johnson*, 532 U. S. 782, 799, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001), and neither history nor common experience show that the jury system is rife with mischief of these or similar kinds. To attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny. "It is not at all clear . . . that the jury system could survive such efforts to perfect it." *Tanner*, 483 U. S., at 120, 107 S. Ct. 2739, 97 L. Ed. 2d 90.

The same cannot be said about racial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice. This Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to **[***29]** ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy.

Racial bias is distinct in a pragmatic sense as well. *HN9*[⬆] *LEdHN[9]*[⬆] [9] In past cases this Court has relied on other safeguards to protect the right to an impartial jury. Some of those safeguards, to be sure, can disclose racial bias. *Voir dire* at the outset of trial, observation of juror demeanor and conduct during trial, juror reports before the verdict, and nonjuror evidence after trial are important mechanisms for discovering bias. Yet their operation may be compromised, or they may prove insufficient. **[*869]** For instance, this Court has noted the dilemma faced by trial court judges and counsel in deciding whether to explore potential racial bias at *voir dire*. See *Rosales-Lopez*, *supra*; *Ristaino* v. *Ross*, 424 U. S. 589, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). Generic questions about juror impartiality may not expose specific attitudes or biases that can poison jury deliberations. Yet more pointed questions "could well exacerbate whatever prejudice might exist without substantially aiding in exposing it." *Rosales-Lopez*, *supra*, at 195, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (Rehnquist, J., concurring in result).

The stigma that attends racial bias may make it difficult **[***30]** for a juror to report inappropriate statements during the course of juror deliberations. It is one thing to accuse a fellow juror of having a personal experience that improperly influences her consideration of the case, as would have been required in *Warger*. It is quite another to call her a bigot.

The recognition that certain of the *Tanner* safeguards may be less effective in rooting out racial bias than other kinds of bias is not dispositive. All forms of improper bias pose challenges to the trial process. But there **[**125]** is a sound basis to treat racial bias with added precaution. A constitutional rule that racial bias in

the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right.

B

For the reasons explained above, the Court now holds that *HN10*[⬆] *LEdHN[10]*[⬆] [10] where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting **[***31]** denial of the jury trial guarantee.

Not every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry. For the inquiry to proceed, there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict. To qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict. Whether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence.

The practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors. See 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence §6076, pp. 580-583 (2d ed. 2007) (Wright); see also Variations of ABA Model Rules of Professional Conduct, **[***32]** Rule 3.5 (Sept. 15, 2016) (overview of state ethics rules); 2 Jurywork Systematic Techniques §13:18 (2016-2017) (overview of Federal District Court rules).

These limits seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered. But while a juror can always tell counsel they do not wish to discuss the case, jurors in some instances may come forward of their own accord.

**[*870]** That is what happened here. In this case the alleged statements by a juror were egregious and unmistakable in their reliance on racial bias. Not only did juror H. C. deploy a dangerous racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed, but he also encouraged other jurors to join him in convicting on that basis.

Petitioner's counsel did not seek out the two jurors' allegations of racial bias. Pursuant to Colorado's mandatory jury instruction, the trial court had set limits on juror contact and encouraged jurors to inform the court if anyone harassed them about their role in the case. Similar limits on juror contact can be found in other jurisdictions that recognize a racial-bias exception. See, *e.g.,* Fla. Standard Jury Instrs. in Crim. **[***33]** Cases No. 4.2 (West 2016) ("Although you are at liberty to speak with anyone about your deliberations, you are also at liberty to refuse to speak to anyone"); **[**126]** Mass. Office of Jury Comm'r, Trial Juror's Handbook (Dec. 2015) ("You are not required to speak with anyone once the trial is over. . . . If anyone tries to learn this confidential information from you, or if you feel harassed or embarrassed in any way, you should report it to the court . . . immediately"); N. J. Crim. Model Jury Charges, Non 2C Charges, Dismissal of Jury (2014) ("It will be up to each of you to decide whether to speak about your service as a juror").

With the understanding that they were under no obligation to speak out, the jurors approached petitioner's counsel, within a short time after the verdict, to relay their concerns about H. C.'s statements. App. 77. A similar pattern is common in cases involving juror allegations of racial bias. See, *e.g., Villar*, 586 F. 3d, at 78 (juror e-mailed

defense counsel within hours of the verdict); *Kittle* v. *United States*, 65 A. 3d 1144, 1147 (D. C. 2013) (juror wrote a letter to the judge the same day the court discharged the jury); *Benally*, 546 F. 3d, at 1231 (juror approached defense counsel the day after the jury announced its verdict). Pursuant to local court rules, petitioner's **[***34]** counsel then sought and received permission from the court to contact the two jurors and obtain affidavits limited to recounting the exact statements made by H. C. that exhibited racial bias.

While the trial court concluded that Colorado's Rule 606(b) did not permit it even to consider the resulting affidavits, the Court's holding today removes that bar. When jurors disclose an instance of racial bias as serious as the one involved in this case, the law must not wholly disregard its occurrence.

## C

As the preceding discussion makes clear, the Court relies on the experiences of the 17 jurisdictions that have recognized a racial-bias exception to the no-impeachment rule—some for over half a century—with no signs of an increase in juror harassment or a loss of juror willingness to engage in searching and candid deliberations.

The experience of these jurisdictions, and the experience of the courts going forward, will inform the proper exercise of trial judge discretion in these and related matters. This case does not ask, and the Court need not address, what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias. See 27 Wright 575-578 (noting a divergence **[***35]** of authority over the necessity and scope of an evidentiary hearing on alleged juror misconduct). The Court also does not decide the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and a new trial be granted. Compare, **[*871]** *e.g., Shillcutt*, 827 F. 2d, at 1159 (inquiring whether racial bias "pervaded the jury room"), with, *e.g., Henley*, 238 F. 3d, at 1120

("One racist juror would be enough").

## D

It is proper to observe as well that there are standard and existing processes designed to prevent racial bias in jury deliberations. The advantages of careful *voir dire* have already been noted. And other safeguards deserve mention.

Trial courts, often at the outset of the case and again in their final jury instructions, explain the jurors' duty **[**127]** to review the evidence and reach a verdict in a fair and impartial way, free from bias of any kind. Some instructions are framed by trial judges based on their own learning and experience. Model jury instructions likely take into account these continuing developments and are common across jurisdictions. See, *e.g.,* 1A K. O'Malley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal §10:01, p. 22 (6th ed. 2008) ("Perform these duties **[***36]** fairly. Do not let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way"). Instructions may emphasize the group dynamic of deliberations by urging jurors to share their questions and conclusions with their colleagues. See, *e.g., id*., §20:01, at 841 ("It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so without violence to individual judgment").

Probing and thoughtful deliberation improves the likelihood that other jurors can confront the flawed nature of reasoning that is prompted or influenced by improper biases, whether racial or otherwise. These dynamics can help ensure that the exception is limited to rare cases.

\*\*\*

*HN11*[⬆] *LEdHN[11]*[⬆] [11] The Nation must continue to make strides to overcome race-based discrimination. The progress that has already been made underlies the Court's insistence that blatant racial prejudice is antithetical to the functioning of

the jury system and must be confronted in egregious cases like this one despite the general bar of the no-impeachment rule. It is the mark of a maturing legal system that it seeks to understand and to implement **[***37]** the lessons of history. The Court now seeks to strengthen the broader principle that society can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution.

The judgment of the Supreme Court of Colorado is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

886 contd

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

APPENDIX

*Codified Exceptions in Addition to Those Enumerated in Fed. Rule Evid. 606(b)*

See Ariz. Rules Crim. Proc. 24.1(c)(3), (d) (2011) (exception for evidence of misconduct, including verdict by game of chance or intoxication); Idaho Rule Evid. 606(b) (2016) (game of chance); Ind. Rule Evid. 606(b)(2)(A) (Burns 2014) (drug or alcohol use); Minn. Rule Evid. 606(b) (2014) (threats of violence or violent acts); Mont. Rule Evid. 606(b) (2015) (game of chance); N. D. Rule Evid. 606(b)(2)(C) (2016-2017) (same); Tenn. Rule Evid. 606(b) (2016) (quotient verdict or game of chance); Tex. Rule Evid. 606(b)(2)(B) (West 2016) (rebutting claim juror was unqualified); Vt. Rule Evid. 606(b) (Cum. Supp. 2016) (juror communication with nonjuror); see also 27 C. Wright & V. Gold, Federal Practice and Procedure: Evidence §6071, p. 447, and n. 66 (2d ed. 2007); *id.,* at 451, and n. 70; *id.,* at 452, and n. 72.

*Judicially* **[***38]** *Recognized Exceptions for*

*Evidence of Racial Bias*

**[**128]** See *State* v. *Santiago*, 245 Conn. 301, 323-340, 715 A. 2d 1, 14-22 (1998); *Kittle* v. *United States*, 65 A. 3d 1144, 1154-1156 (D. C. 2013); *Fisher* v. *State*, 690 A. 2d 917, 919-921, and n. 4 (Del. 1996) (Appendix to opinion), *Powell* v. *Allstate Ins. Co.*, 652 So. 2d 354, 357-358 (Fla. 1995); *Spencer* v. *State*, 260 Ga. 640, 643-644, 398 S. E. 2d 179, 184-185 (1990); *State* v. *Jackson*, 81 Haw. 39, 48-49, 912 P. 2d 71, 80-81 (1996); *Commonwealth* v. *Laguer*, 410 Mass. 89, 97-98, 571 N. E. 2d 371, 376 (1991); *State* v. *Callender*, 297 N. W. 2d 744, 746 (Minn. 1980); *Fleshner* v. *Pepose Vision Inst., P. C.*, 304 S. W. 3d 81, 87-90 (Mo. 2010); *State* v. *Levitt*, 36 N. J. 266, 271-273, 176 A. 2d 465, 467-468 (1961); *People* v. *Rukaj*, 123 App. Div. 2d 277, 280-281, 506 N. Y. S. 2d 677, 679-680 (1986); *State* v. *Hidanovic*, 2008 ND 66, ¶¶21-26, 747 N. W. 2d 463, 472-474; *State* v. *Brown*, 62 A. 3d 1099, 1110 (R. I. 2013); *State* v. *Hunter*, 320 S. C. 85, 88, 463 S. E. 2d 314, 316 (1995); *Seattle* v. *Jackson*, 70 Wash. 2d 733, 738, 425 P. 2d 385, 389 (1967); *After Hour Welding, Inc.* v. *Laneil Management Co.*, 108 Wis. 2d 734, 739-740, 324 N. W. 2d 686, 690 (1982).

**Dissent by:** Thomas; Alito

# Dissent

**[*871contd]**

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

Justice Thomas, dissenting.

The Court today holds that the Sixth Amendment requires the States to provide a criminal defendant the opportunity to impeach a jury's guilty verdict with juror testimony about a juror's alleged racial bias, notwithstanding a state procedural rule forbidding such testimony. I agree with Justice

Alito that the Court's decision is incompatible with the text of the Amendment it purports to interpret and with our precedents. I write separately to explain that the Court's holding also cannot be squared with the original understanding of the Sixth or Fourteenth Amendments.

I

The Sixth Amendment's protection of the right, "[i]n all criminal prosecutions," **[*872]** to a "trial, by an impartial jury," is limited to the protections that existed at common law when the Amendment was ratified. See, *e.g., Apprendi* v. *New Jersey*, 530 U. S. 466, 500, 120 S. Ct. 2348, 147 L. Ed. 2d 435, and n. 1 (2000) (Thomas, J., concurring); 3 J. Story, Commentaries on the Constitution of the United States §1773, pp. 652-653 (1833) (Story) (explaining that "the trial by jury in criminal cases" protected by the Constitution is the same "great privilege" that was "a part of that admirable common law" of England); cf. 5 St. G. Tucker, Blackstone's **[***39]** Commentaries 349, n. 2 (1803). It is therefore "entirely proper to look to the common law" to ascertain whether the Sixth Amendment requires the result the Court today reaches. *Apprendi*, *supra,* at 500, n. 1, 120 S. Ct. 2348, 147 L. Ed. 2d 435.

The Sixth Amendment's specific guarantee of impartiality incorporates the common-law understanding of that term. See, *e.g.,* 3 W. Blackstone, Commentaries on the Laws of England 365 (1769) (Blackstone) (describing English trials as "impartially just" because of their "caution against all partiality and bias" in the jury). The common law required a juror to have "freedome of mind" and to be "indifferent as hee stands unsworne." 1 E. Coke, First Part of the Institutes of the Laws of England §234, p. 155a **[**129]** (16th ed. 1809); accord, 3 M. Bacon, A New Abridgment of the Law 258 (3d ed. 1768); cf. T. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 319 (1868) ("The jury must be indifferent between the prisoner and the commonwealth"). Impartial jurors could "have no

interest of their own affected, and no personal bias, or pre-possession, in favor [of] or against either party." *Pettis* v. *Warren*, 1 Kirby 426, 427 (Conn. Super. 1788).

II

The common-law right to a jury trial did not, however, guarantee a defendant the right **[***40]** to impeach a jury verdict with juror testimony about juror misconduct, including "a principal species of [juror] misbehaviour"—"notorious partiality." 3 Blackstone 388. Although partiality was a ground for setting aside a jury verdict, *ibid.,* the English common-law rule at the time the Sixth Amendment was ratified did not allow jurors to supply evidence of that misconduct. In 1770, Lord Mansfield refused to receive a juror's affidavit to impeach a verdict, declaring that such an affidavit "can't be read." *Rex* v. *Almon*, 5 Burr. 2687, 98 Eng. Rep. 411 (K. B.). And in 1785, Lord Mansfield solidified the doctrine, holding that "[t]he Court [could not] receive such an affidavit from any of the jurymen" to prove that the jury had cast lots to reach a verdict. *Vaise* v. *Delaval*, 1 T. R. 11, 99 Eng. Rep. 944 (K. B.). [1]

At the time of the founding, the States took mixed approaches to this issue. See *Cluggage* v. *Swan*, 4 Binn. 150, 156 (Pa. 1811) (opinion of Yeates, J.) ("The opinions of *American* judges . . . have greatly differed on the point in question"); *Bishop* v. *Georgia*, 9 Ga. 121, 126 (1850) (describing the common law in 1776 on this question as "in a *transition* state"). Many States followed **[*873]** Lord Mansfield's no-impeachment rule and refused

---

[1] Prior to 1770, it appears that juror affidavits were sometimes received to impeach a verdict on the ground of juror misbehavior, although only "with great caution." *McDonald* v. *Pless*, 238 U. S. 264, 268, 35 S. Ct. 783, 59 L. Ed. 1300 (1915); see, *e.g., Dent* v. *The Hundred of Hertford*, 2 Salk. 645, 91 Eng. Rep. 546 (K. B. 1696); *Philips* v. *Fowler*, Barnes. 441, 94 Eng. Rep. 994 (K. B. 1735). But "previous to our Revolution, and at least as early as 1770, the doctrine in England was distinctly ruled the other way, and has so stood ever since." 3 T. Waterman, A Treatise on the Principles of Law and Equity Which Govern Courts in the Granting of New Trials in Cases Civil and Criminal 1429 (1855).

to receive juror affidavits. See, *e.g., Brewster* v. *Thompson*, 1 N. J. L. 32 (1790) (*per curiam*); *Robbins* v. *Windover*, 2 Tyl. 11, 14 (Vt. 1802); *Taylor* v. *Giger*, 3 Ky. 586, 597-598 (1808); *Price* v. *McIlvain*, 2 Tread. 503, 504 (S. C. 1815); *Tyler* v. *Stevens*, 4 N. H. 116, 117 (1827); 1 Z. Swift, A Digest of the Laws of **[***41]** the State of Connecticut 775 (1822) ("In England, and in the courts of the United States, jurors are not permitted to be witnesses respecting the misconduct of the jury . . . and this is, most unquestionably, the correct principle"). Some States, however, permitted juror affidavits about juror misconduct. See, *e.g., Crawford* v. *State*, 10 Tenn. 60, 68 (1821); *Cochran* v. *Street*, 1 Va. 79, 81, 1 Wash. 79 (1792). And others initially permitted such evidence but quickly reversed course. Compare, *e.g., Smith* v. *Cheetham*, 3 Cai. R. 57, 59-60 (N. Y. **[**130]** 1805) (opinion of Livingston, J.) (permitting juror testimony), with *Dana* v. *Tucker*, 4 Johns. 487, 488-489 (N. Y. 1809) (*per curiam*) (overturning *Cheetham*); compare also *Bradley's Bradley's Lessee* v. *Bradley*, 4 U.S. 112, 4 Dall. 112, 1 L. Ed. 763 (Pa. 1792) (permitting juror affidavits), with, *e.g., Cluggage*, *supra,* at 156-158 (opinion of Yeates, J.) (explaining that *Bradley* was incorrectly reported and rejecting affidavits); compare also *Talmadge* v. *Northrop*, 1 Root 522 (Conn. 1793) (admitting juror testimony), with *State* v. *Freeman*, 5 Conn. 348, 350-352 (1824) ("The opinion of almost the whole legal world is adverse to the reception of the testimony in question; and, in my opinion, on invincible foundations").

By the time the Fourteenth Amendment was ratified, Lord Mansfield's no-impeachment rule had become firmly entrenched in American law. See Lettow, New Trial for Verdict Against Law: Judge-Jury Relations in Early-Nineteenth Century America, 71 Notre Dame L. Rev. 505, 536 (1996) ("[O]pponents of juror affidavits had largely won out by the middle of the century"); 8 J. Wigmore, **[***42]** Evidence in Trials at Common Law §2352, p. 697 (J. McNaughton rev. 1961) (Wigmore) (Lord Mansfield's rule "came to receive

in the United States an adherence almost unquestioned"); J. Proffatt, A Treatise on Trial by Jury §408, p. 467 (1877) ("It is a well established rule of law that no affidavit shall be received from a juror to impeach his verdict"). The vast majority of States adopted the no-impeachment rule as a matter of common law. See, *e.g., Bull* v. *Commonwealth*, 55 Va. 613, 627-628 (1857) ("[T]he practice appears to be now generally settled, to reject the testimony of jurors when offered to impeach their verdict. The cases on the subject are too numerous to be cited"); *Tucker* v. *Town Council of South Kingstown*, 5 R. I. 558, 560 (1859) (collecting cases); *State* v. *Coupenhaver*, 39 Mo. 430 (1867) ("The law is well settled that a traverse juror cannot be a witness to prove misbehavior in the jury in regard to their verdict"); *Peck* v. *Brewer*, 48 Ill. 54, 63 (1868) ("So far back as . . . 1823, the doctrine was held that the affidavits of jurors cannot be heard to impeach their verdict"); *Heffron* v. *Gallupe*, 55 Me. 563, 566 (1868) (ruling inadmissible "depositions of . . . jurors as to what transpired in the jury room"); *Withers* v. *Fiscus*, 40 Ind. 131, 131-132 (1872) ("In the United States it seems to be settled, notwithstanding a few adjudications to the contrary . . ., that such affidavits cannot be received"). [2]

 **[*874]** The Court today acknowledges that the States "adopted **[***43]** the Mansfield rule as a matter of common law," *ante*, at __, 197 L. Ed. 2d, at 118, but ascribes no significance to that fact. I would hold that it is dispositive. Our common-law history does not establish that—in either 1791 (when the Sixth Amendment was ratified) or 1868 (when the Fourteenth Amendment was ratified)—a defendant had the right to impeach a verdict with juror testimony of juror misconduct. In fact, it strongly suggests that such evidence was prohibited. In the absence of a definitive common-

---

[2] Although two States declined to follow the rule in the mid-19th century, see *Wright* v. *Illinois & Miss. Tel. Co.*, 20 Iowa 195, 210 (1866); *Perry* v. *Bailey*, 12 Kan. 539, 544-545 (1874), "most of the state courts" had already "committed themselves upon the subject," 8 Wigmore §2354, at 702.

law tradition permitting impeachment by juror testimony, we have no basis to **[**131]** invoke a constitutional provision that merely "follow[s] out the established course of the common law in all trials for crimes," 3 Story §1785, at 662, to overturn Colorado's decision to preserve the no-impeachment rule, cf. *Boumediene* v. *Bush*, 553 U. S. 723, 832-833, 128 S. Ct. 2229, 171 L. Ed. 2d 41 (2008) (Scalia, J., dissenting).

\*\*\*

Perhaps good reasons exist to curtail or abandon the no-impeachment rule. Some States have done so, see Appendix to majority opinion, *ante*, and others have not. Ultimately, that question is not for us to decide. It should be left to the political process described by Justice Alito. See post, at ___ - ___, 197 L. Ed. 2d, at 133-135 (dissenting opinion). In its attempt to stimulate a "thoughtful, rational dialogue" on race relations, *ante*, at ___, 197 L. Ed. 2d, at 127, the Court today **[***44]** ends the political process and imposes a uniform, national rule. The Constitution does not require such a rule. Neither should we.

I respectfully dissent.

Justice Alito, with whom THE CHIEF JUSTICE and Justice Thomas join, dissenting.

Our legal system has many rules that restrict the admission of evidence of statements made under circumstances in which confidentiality is thought to be essential. Statements made to an attorney in obtaining legal advice, statements to a treating physician, and statements made to a spouse or member of the clergy are familiar examples. See *Trammel* v. *United States*, 445 U. S. 40, 51, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980). Even if a criminal defendant whose constitutional rights are at stake has a critical need to obtain and introduce evidence of such statements, long-established rules stand in the way. The goal of avoiding interference with confidential communications of great value has long been thought to justify the loss of important evidence and the effect on our justice system that this loss entails.

The present case concerns a rule like those just mentioned, namely, the age-old rule against attempting to overturn or "impeach" a jury's verdict by offering statements made by jurors during the course of deliberations. For centuries, **[***45]** it has been the judgment of experienced judges, trial attorneys, scholars, and lawmakers that allowing jurors to testify after a trial about what took place in the jury room would undermine the system of trial by jury that is integral to our legal system.

Juries occupy a unique place in our justice system. The other participants in a trial—the presiding judge, the attorneys, the witnesses—function in an arena governed by strict rules of law. Their every word is recorded and may be closely scrutinized for missteps.

When jurors retire to deliberate, however, they enter a space that is not regulated in the same way. Jurors are ordinary people. They are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives. Our Constitution places great value on this way of thinking, speaking, and deciding. The jury trial right protects parties in **[*875]** court cases from being judged by a special class of trained professionals who do not speak the language of ordinary people and may **[**132]** not understand or appreciate the way ordinary people live their lives. To protect that right, the door to the jury room has been locked, and the confidentiality of jury deliberations has **[***46]** been closely guarded.

Today, with the admirable intention of providing justice for one criminal defendant, the Court not only pries open the door; it rules that respecting the privacy of the jury room, as our legal system has done for centuries, violates the Constitution. This is a startling development, and although the Court tries to limit the degree of intrusion, it is doubtful that there are principled grounds for preventing the expansion of today's holding.

The Court justifies its decision on the ground that the nature of the confidential communication at issue in this particular case—a clear expression of what the Court terms racial bias [1]—is uniquely harmful to our criminal justice system. And the Court is surely correct that even a tincture of racial bias can inflict great damage on that system, which is dependent on the public's trust. But until today, the argument that the Court now finds convincing has not been thought to be sufficient to overcome confidentiality rules like the one at issue here.

Suppose that a prosecution witness gives devastating but false testimony against a defendant, and suppose that the witness's motivation is racial bias. Suppose that the witness admits [***47] this to his attorney, his spouse, and a member of the clergy. Suppose that the defendant, threatened with conviction for a serious crime and a lengthy term of imprisonment, seeks to compel the attorney, the spouse, or the member of the clergy to testify about the witness's admissions. Even though the constitutional rights of the defendant hang in the balance, the defendant's efforts to obtain the testimony would fail. The Court provides no good reason why the result in this case should not be the same.

I

Rules barring the admission of juror testimony to impeach a verdict (so-called "no-impeachment rules") have a long history. Indeed, they pre-date the ratification of the Constitution. They are typically traced back to *Vaise* v. *Delaval*, 1 T. R. 11, 99 Eng. Rep. 944 (K. B. 1785), in which Lord Mansfield declined to consider an affidavit from two jurors who claimed that the jury had reached its verdict by lot. See *Warger* v. *Shauers*, 574 U. S. ___, ___, 135 S. Ct. 521, 526, 190 L. Ed. 2d 422,

---

[1] The bias at issue in this case was a "bias against Mexican men." App. 160. This might be described as bias based on national origin or ethnicity. Cf. *Hernandez* v. *New York*, 500 U. S. 352, 355, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) (plurality opinion); *Hernandez* v. *Texas*, 347 U. S. 475, 479, 74 S. Ct. 667, 98 L. Ed. 866 (1954). However, no party has suggested that these distinctions make a substantive difference in this case.

428 (2014) . Lord Mansfield's approach "soon took root in the United States," *ibid.,* and "[b]y the beginning of [the 20th] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict," *Tanner* v. *United States*, 483 U. S. 107, 117, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987); see 27 C. Wright [***48] & V. Gold, Federal Practice and Procedure: Evidence §6071, p. 431 (2d ed. 2007) (Wright & Gold) [**133] (noting that the Mansfield approach "came to be accepted in almost all states").

In *McDonald* v. *Pless*, 238 U. S. 264, 35 S. Ct. 783, 59 L. Ed. 1300 (1915), this Court adopted a strict no-impeachment rule for [*876] cases in federal court. *McDonald* involved allegations that the jury had entered a quotient verdict—that is, that it had calculated a damages award by taking the average of the jurors' suggestions. *Id.*, at 265-266, 35 S. Ct. 783, 59 L. Ed. 1300. The Court held that evidence of this misconduct could not be used. *Id.,* at 269, 35 S. Ct. 783, 59 L. Ed. 1300. It applied what it said was "unquestionably the general rule, that the losing party cannot, in order to secure a new trial, use the testimony of jurors to impeach their verdict." *Ibid*. The Court recognized that the defendant had a powerful interest in demonstrating that the jury had "adopted an arbitrary and unjust method in arriving at their verdict." *Id.*, at 267, 35 S. Ct. 783, 59 L. Ed. 1300. "But," the Court warned, "let it once be established that verdicts . . . can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding." *Ibid*. This would lead to "harass[ment]" of [***49] jurors and "the destruction of all frankness and freedom of discussion and conference." *Id.*, at 267-268, 35 S. Ct. 783, 59 L. Ed. 1300. Ultimately, even though the no-impeachment rule "may often exclude the only possible evidence of misconduct," relaxing the rule "would open the door to the most pernicious arts and tampering with jurors." *Id.*, at 268, 35 S.

Ct. 783, 59 L. Ed. 1300 (internal quotation marks omitted).

The firm no-impeachment approach taken in *McDonald* came to be known as "the federal rule." This approach categorically bars testimony about jury deliberations, except where it is offered to demonstrate that the jury was subjected to an extraneous influence (for example, an attempt to bribe a juror). *Warger*, *supra*, at ___, 135 S. Ct. 521, 190 L. Ed. 2d 422 (slip op., at 5); *Tanner*, *supra*, at 117, 107 S. Ct. 2739, 97 L. Ed. 2d 90; [2] see 27 Wright & Gold §6071, at 432-433.

Some jurisdictions, notably Iowa, adopted a more permissive rule. Under the Iowa rule, jurors were generally permitted to testify about any subject except their "subjective intentions and thought processes in reaching a verdict." *Warger*, *supra*, at ___, 135 S. Ct. 521, 526, 190 L. Ed. 2d 422, 428. Accordingly, the Iowa rule allowed jurors to "testify as to events or conditions which might have improperly influenced the verdict, even if these took place during deliberations within the jury room." 27 Wright & Gold §6071, at 432.

Debate between proponents of the federal rule and [***50] the Iowa rule emerged during the framing and adoption of Federal Rule of Evidence 606(b). Both sides had their supporters. The contending arguments were [**134] heard and considered, and in the end the strict federal approach was retained.

An early draft of the Advisory Committee on the Federal Rules of Evidence included a version of the Iowa rule, 51 F. R. D. 315, 387-388 (1971). That draft was forcefully criticized, however, [3] and the

[*877] Committee ultimately produced a revised draft that retained the well-established federal approach. *Tanner*, *supra*, at 122, 107 S. Ct. 2739, 97 L. Ed. 2d 90; see Committee on Rules of Practice and Procedure of the Judicial Conference of the United States, Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates 73 (Oct. 1971). Expressly repudiating the Iowa rule, the new draft provided that jurors generally could not testify "as to any matter or statement occurring during the course of the jury's deliberations." *Ibid.* This new version was approved by the Judicial Conference and sent to this Court, which adopted the rule and referred it to Congress. 56 F. R. D. 183, 265-266 (1972).

Initially, the House rejected this Court's version of Rule 606(b) and instead reverted to the earlier (and narrower) Advisory Committee draft. *Tanner*, *supra*, at 123, 107 S. Ct. 2739, 97 L. Ed. 2d 90; see H. R. Rep. No. 93-650, pp. 9-10 (1973) (criticizing [***51] the Supreme Court draft for preventing jurors from testifying about "quotient verdict[s]" and other "irregularities which occurred in the jury room"). In the Senate, however, the Judiciary Committee favored this Court's rule. The Committee Report observed that the House draft broke with "long-accepted Federal law" by allowing verdicts to be "challenge[d] on the basis of what happened during the jury's internal deliberations." S. Rep. No. 93-1277, p. 13 (1974) (S. Rep.). In the view of the Senate Committee, the House rule would have "permit[ted] the harassment of former jurors" as well as "the possible exploitation of disgruntled or otherwise badly-

---

[2] As this Court has explained, the extraneous influence exception "do[es] not detract from, but rather harmonize[s] with, the weighty government interest in insulating the jury's deliberative process." *Tanner*, 483 U. S., at 120, 107 S. Ct. 2739, 97 L. Ed. 2d 90. The extraneous influence exception, like the no-impeachment rule itself, is directed at protecting jury deliberations against unwarranted interference. *Ibid.*

[3] In particular, the Justice Department observed that "[s]trong policy

considerations continue to support" the federal approach and that "[r]ecent experience has shown that the danger of harassment of jurors by unsuccessful litigants warrants a rule which imposes strict limitations on the instances in which jurors may be questioned about their verdict." Letter from R. Kliendienst, Deputy Attorney General, to Judge A. Maris (Aug. 9, 1971), 117 Cong. Rec. 33648, 33655 (1971). And Senator McClellan, an influential member of the Senate Judiciary Committee, insisted that the "mischief in this Rule ought to be plain for all to see" and that it would be impossible "to conduct trials, particularly criminal prosecutions, as we know them today, if every verdict were followed by a post-trial hearing into the conduct of the juror's deliberations." Letter from Sen. J. McClellan to Judge A. Maris (Aug. 12, 1971), *id.,* at 33642, 33645.

motivated ex-jurors." *Id.*, at 14. This result would have undermined the finality of verdicts, violated "common fairness," and prevented jurors from "function[ing] effectively." *Ibid.* The Senate rejected the House version of the rule and returned to the Court's rule. A Conference Committee adopted the Senate version, see H. R. Conf. Rep. No. 93-1597, p. 8 (1974), and this version was passed by both Houses and was signed into law by the President.

As this summary shows, the process that culminated in the adoption of Federal Rule of Evidence 606(b) was the epitome of reasoned democratic rulemaking. The "distinguished, Supreme [***52] Court-appointed" members of the Advisory Committee went through a 7-year drafting process, "produced two well-circulated [**135] drafts," and "considered numerous comments from persons involved in nearly every area of court-related law." Rothstein, The Proposed Amendments to the Federal Rules of Evidence, 62 Geo. L. J. 125 (1973). The work of the Committee was considered and approved by the experienced appellate and trial judges serving on the Judicial Conference and by our predecessors on this Court. After that, the matter went to Congress, which "specifically understood, considered, and rejected a version of [the rule] that would have allowed jurors to testify on juror conduct during deliberations." *Tanner*, 483 U. S., at 125, 107 S. Ct. 2739, 97 L. Ed. 2d 90. The judgment of all these participants in the process, which was informed by their assessment of an empirical issue, *i.e.*, the effect that the competing Iowa rule would have had on the jury system, is entitled to great respect.

Colorado considered this same question, made the same judgment as the participants in the federal process, and adopted a very similar rule. In doing so, it joined [*878] the overwhelming majority of States. *Ante*, at ___, 197 L. Ed. 2d, at 119. In the great majority of jurisdictions, strong no-impeachment rules continue to be "viewed as both promoting the finality of verdicts [***53] and insulating the jury from outside influences."

*Warger*, 574 U. S., at ___, 135 S. Ct. 521, 526, 190 L. Ed. 2d 422, 428).

II

A

Recognizing the importance of Rule 606(b), this Court has twice rebuffed efforts to create a Sixth Amendment exception—first in *Tanner* and then, just two Terms ago, in *Warger.*

The *Tanner* petitioners were convicted of committing mail fraud and conspiring to defraud the United States. 483 U. S., at 109-110, 112-113, 107 S. Ct. 2739, 97 L. Ed. 2d 90. After the trial, two jurors came forward with disturbing stories of juror misconduct. One claimed that several jurors "consumed alcohol during lunch breaks . . . causing them to sleep through the afternoons." *Id.*, at 113, 107 S. Ct. 2739, 97 L. Ed. 2d 90. The second added that jurors also smoked marijuana and ingested cocaine during the trial. *Id.*, at 115-116, 107 S. Ct. 2739, 97 L. Ed. 2d 90. This Court held that evidence of this bacchanalia could properly be excluded under Rule 606(b). *Id.*, at 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90.

The Court noted that "[s]ubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict." *Id.,* at 119, 107 S. Ct. 2739, 97 L. Ed. 2d 90. While there is "little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior," the Court observed, it is "not at all clear . . . that the jury system could survive such efforts to perfect it." *Id.*, at 120,107 S. Ct. 2739, 97 L. Ed. 2d 90. Allowing such post-verdict inquiries would [***54] "seriously disrupt the finality of the process." *Ibid.* It would also undermine "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Id.*, at 120-121, 107 S. Ct. 2739, 97 L. Ed. 2d 90.

The *Tanner* petitioners, of course, had a Sixth Amendment right "to 'a [**136] tribunal both impartial and mentally competent to afford a hearing.'" *Id*., at 126, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (quoting *Jordan* v. *Massachusetts*, 225 U. S. 167, 176, 32 S. Ct. 651, 56 L. Ed. 1038 (1912)). The question, however, was whether they also had a right to an evidentiary hearing featuring "one particular kind of evidence inadmissible under the Federal Rules." 483 U. S., at 126-127, 107 S. Ct. 2739, 97 L. Ed. 2d 90. Turning to that question, the Court noted again that "long-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry." *Id*., at 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90. By contrast, "[p]etitioners' Sixth Amendment interests in an unimpaired jury . . . [were] protected by several aspects of the trial process." *Ibid.*

The Court identified four mechanisms that protect defendants' Sixth Amendment rights. First, jurors can be "examined during *voir dire." Ibid.* Second, "during the trial the jury is observable by the court, by counsel, and by court personnel." *Ibid.* Third, "jurors are observable by each other, and may report inappropriate juror behavior to the court *before [***55]* they render a verdict." *Ibid.* And fourth, "after the trial a party may seek to impeach the verdict by nonjuror evidence of misconduct." *Ibid.* These "other sources of protection of petitioners' right to a competent jury" convinced the Court that the juror testimony was properly excluded. *Ibid*.

*Warger* involved a negligence suit arising from a motorcycle crash. 574 U. S., at ___, 135 S. Ct. 521, 190 L. Ed. 2d 422 (slip op., at 1). During *voir dire*, [*879] the individual who eventually became the jury's foreperson said that she could decide the case fairly and impartially. *Id.,* at ___, 135 S. Ct. 521, 190 L. Ed. 2d 422 (slip op., at 2). After the jury returned a verdict in favor of the defendant, one of the jurors came forward with evidence that called into question the truthfulness of the foreperson's responses during *voir dire*. According to this juror, the foreperson revealed during the deliberations that her daughter had once caused a deadly car crash, and the foreperson expressed the belief that a lawsuit would have ruined her daughter's life. *Ibid.*

In seeking to use this testimony to overturn the jury's verdict, the plaintiff's primary contention was that Rule 606(b) does not apply to evidence concerning a juror's alleged misrepresentations during *voir dire*. If otherwise interpreted, the plaintiff maintained, the rule would threaten [***56] his right to trial by an impartial jury. [4] The Court disagreed, in part because "any claim that Rule 606(b) is unconstitutional in circumstances such as these is foreclosed by our decision in *Tanner*." *Id.,* at ___, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422, 432 ). The Court explained that "[e]ven if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by" two of the other *Tanner* safeguards: pre-verdict reports by the jurors and non-juror evidence. 574 U. S., at ___135 S. Ct. 521, 529, 190 L. Ed. 2d 422, 432 (slip op., at 10).

*Tanner* and *Warger* fit neatly into this Court's broader jurisprudence concerning the constitutionality of evidence rules. As the Court has explained, [**137] "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Holmes* v. *South Carolina*, 547 U. S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (internal quotation marks and alteration omitted). Thus, evidence rules of this sort have been invalidated only if they "serve no legitimate purpose or . . . are disproportionate to the ends that they are asserted to promote." *Id.,* at 326, 26 S. Ct. 1727, 164 L. Ed. 2d 503. *Tanner* and *Warger* recognized that Rule 606(b) serves vital purposes and does not impose a disproportionate burden on the jury trial right.

Today, for the first time, the Court creates a

---

[4] Although *Warger* was a civil case, we wrote that "[t]he Constitution guarantees both criminal and civil litigants a right to an impartial jury." 574 U. S., at ___, 135 S. Ct. 521, 528, 190 L. Ed. 2d 422, 431 ).

constitutional exception to no-impeachment rules. Specifically, the Court holds that no-impeachment [***57] rules violate the Sixth Amendment to the extent that they preclude courts from considering evidence of a juror's racially biased comments. *Ante,* at ___, 197 L. Ed. 2d, at 124. The Court attempts to distinguish *Tanner* and *Warger,* but its efforts fail.

*Tanner* and *Warger* rested on two basic propositions. First, no-impeachment rules advance crucial interests. Second, the right to trial by an impartial jury is adequately protected by mechanisms other than the use of juror testimony regarding jury deliberations. The first of these propositions applies regardless of the nature of the juror misconduct, and the Court does not argue otherwise. Instead, it contends that, in cases involving racially biased jurors, the safeguards are less effective and the defendant's Sixth Amendment interests are more profound. Neither argument is persuasive.

## B

As noted above, identified four "aspects of the trial process" that protect a defendant's Sixth Amendment rights: (1) *voir dire*; (2) observation by the court, counsel, and court personnel; (3) pre-verdict reports by the jurors; and (4) non-juror evidence. [*880] 483 U. S., at 127, 107 S. Ct. 2739, 97 L. Ed. 2d 90. [5] Although the Court insists that that these mechanisms "may be compromised" in cases involving allegations of racial bias, it addresses only two of them and [***58] fails to make a sustained argument about either. *Ante,* at ___, 197 L. Ed. 2d, at 124.

## 1

[5] The majority opinion in this case identifies a fifth mechanism: jury instructions. It observes that, by explaining the jurors' responsibilities, appropriate jury instructions can promote "[p]robing and thoughtful deliberation," which in turn "improves the likelihood that other jurors can confront the flawed nature of reasoning that is prompted or influenced by improper biases." *Ante,* at ___ - ___, 197 L. Ed. 2d, at 127. This mechanism, like those listed in , can help to prevent bias from infecting a verdict.

First, the Court contends that the effectiveness of *voir dire* is questionable in cases involving racial bias because pointed questioning about racial attitudes may highlight racial issues and thereby exacerbate prejudice. *Ibid.* It is far from clear, however, that careful *voir dire* cannot surmount this problem. Lawyers may use questionnaires or individual questioning of prospective jurors [6] in order to elicit frank answers that a juror might be reluctant to voice in [**138] the presence of other prospective jurors. [7] Moreover, practice guides are replete with advice on conducting effective *voir dire* on the subject of race. They outline a variety of subtle and nuanced approaches that avoid pointed questions. [8] And of course, if an attorney is

[6] Both of those techniques were used in this case for other purposes. App. 13-14; Tr. 56-78 (Feb. 23, 2010, morning session).

[7] See *People* v. *Harlan*, 8 P. 3d 448, 500 (Colo. 2000) ("The trial court took precautions at the outset of the trial to foreclose the injection of improper racial considerations by including questions concerning racial issues in the jury questionnaire"); *Brewer* v. *Marshall,* 119 F. 3d 993, 996 (CA1 1997) ("The judge asked each juror, out of the presence of other jurors, whether they had any bias or prejudice for or against black persons or persons of Hispanic origin"); 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure §22.3(a), p. 92 (4th ed. 2015) (noting that "[j]udges commonly allow jurors to approach the bench and discuss sensitive matters there" and are also free to conduct "in chambers discussions").

[8] See, *e.g.*, J. Gobert, E. Kreitzberg, & C. Rose, Jury Selection: The Law, Art, and Science of Selecting a Jury §7:41, pp. 357-358 (3d ed. 2014) (explaining that "the issue should be approached more indirectly" and suggesting the use of "[o]pen-ended questions" on subjects like "the composition of the neighborhood in which the juror lives, the juror's relationship with co-workers or neighbors of different races, or the juror's past experiences with persons of other races"); W. Jordan, Jury Selection §8.11, p. 237 (1980) (explaining that "the whole matter of prejudice" should be approached "delicately and cautiously" and giving an example of an indirect question that avoids the word "prejudice"); R. Wenke, The Art of Selecting a Jury 67 (1979) (discussing questions that could identify biased jurors when "your client is a member of a minority group"); *id.*, at 66 (suggesting that instead of "asking a juror if he is 'prejudiced'" the attorney should "inquire about his 'feeling,' 'belief' or 'opinion'"); 2 National Jury Project, Inc., Jurywork: Systematic Techniques §17.23 (E. Krauss ed., 2d ed. 2010) (listing sample questions about racial prejudice); A. Grine & E. Coward, Raising Issues of Race in North Carolina Criminal Cases, p. 8-14 (2014) (suggesting that attorneys "share a brief example about a judgment shaped by a racial stereotype" to make it easier for jurors

concerned that a juror is concealing bias, a peremptory strike may be used. [9]

 [*881] The suggestion that *voir dire* is ineffective in unearthing bias runs counter to decisions of this Court holding that *voir dire* on the subject of race is constitutionally required in some cases, mandated as a matter of federal supervisory authority in others, and typically advisable in any case [***59] if a defendant requests it. See *Turner* v. *Murray*, 476 U. S. 28, 36-37, [**139] 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986); *Rosales-Lopez* v. *United States*, 451 U. S. 182, 192, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981) (plurality opinion); *Ristaino* v. *Ross*, 424 U. S. 589, 597, n. 9, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). If *voir dire* were not useful in identifying racial prejudice, those decisions would be pointless. Cf. *Turner*, *supra*, at 36, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (plurality opinion) (noting

---

to share their own biased views), http://defendermanuals.sog.unc.edu/race/8-addressing-race-trial (as last visited Mar. 3, 2017); *id.*, at 8-15 to 8-17 (suggesting additional strategies and providing sample questions); T. Mauet, Trial Techniques 44 (8th ed. 2010) (suggesting that "likely beliefs and attitudes are more accurately learned through indirection"); J. Lieberman & B. Sales, Scientific Jury Selection 114-115 (2007) (discussing research suggesting that "participants were more likely to admit they were unable to abide by legal due process guarantees when asked open-ended questions that did not direct their responses").

[9] To the extent race does become salient during *voir dire*, there is social science research suggesting that this may actually combat rather than reinforce the jurors' biases. See, *e.g.*, Lee, A New Approach to *Voir Dire* on Racial Bias, 5 U. C. Irvine L. Rev. 843, 861 (2015) ("A wealth of fairly recent empirical research has shown that when race is made salient either through pretrial publicity, voir dire questioning of prospective jurors, opening and closing arguments, or witness testimony, White jurors are more likely to treat similarly situated Black and White defendants the same way"). See also Sommers & Ellsworth, White Juror Bias: An Investigation of Prejudice Against Black Defendants in the American Courtroom, 7 Psychology, Pub. Pol'y, & L. 201, 222 (2001); Sommers & Ellsworth, How Much Do We Really Know About Race and Juries? A Review of Social Science Theory and Research, 78 Chi.-Kent L. Rev. 997, 1013-1014, 1027 (2003); Schuller, Kazoleas, & Kawakami, The Impact of Prejudice Screening Procedures on Racial Bias in the Courtroom, 33 Law & Human Behavior 320, 326 (2009); Cohn, Bucolo, Pride, & Somers, Reducing White Juror Bias: The Role of Race Salience and Racial Attitudes, 39 J. Applied Soc. Psychology 1953, 1964-1965 (2009).

"the ease with which [the] risk [of racial bias] could have been minimized" through *voir dire*). Even the majority recognizes the "advantages of careful *voir dire*" as a "proces[s] designed to prevent racial bias in jury deliberations." *Ante,* at ___, 197 L. Ed. 2d, at 126. And reported decisions substantiate that *voir dire* can be effective in this regard. *E.g.*, *Brewer* v. *Marshall,* 119 F. 3d 993, 995-996 (CA1 1997); *United States* v. *Hasting*, 739 F. 2d 1269, 1271 (CA7 1984); *People* v. *Harlan*, 8 P. 3d 448, 500 (Colo. 2000); see Brief for Respondent 23-24, n. 7 (listing additional cases). Thus, while *voir dire* is not a magic cure, there are good reasons to think that it is a valuable tool.

In any event, the critical point for present purposes is that the effectiveness of *voir dire* is a debatable empirical proposition. Its assessment should be addressed in the process of developing federal and state evidence rules. Federal and state rulemakers can try a variety of approaches, and they can make changes in response to the insights provided by experience and research. The approach taken by today's majority—imposing a federal constitutional rule on the entire country—prevents experimentation [***60] and makes change exceedingly hard. [10]

2

The majority also argues—even more cursorily—that "racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." [*882] *Ante,* at ___, 197 L. Ed. 2d, at 124. This is so, we are told, because it is difficult to "call [another juror] a bigot." *Ibid.*

Since the Court's decision mandates the admission

---

[10] It is worth noting that, even if *voir dire* were entirely ineffective at detecting racial bias (a proposition no one defends), that still would not suffice to distinguish this case from *Warger* v. *Shauers*, 574 U. S. ___, 135 S. Ct. 521, 190 L. Ed. 2d 422 (2014). After all, the allegation in *Warger* was that the foreperson had entirely circumvented *voir dire* by lying in order to shield her bias. The Court, nevertheless, concluded that even where "jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured" through other means. *Id.*, at ___, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422, 429).

of the testimony of one juror about a statement made by another juror during deliberations, what the Court must mean in making this argument is that jurors are less willing to report biased comments by fellow jurors prior to the beginning of deliberations (while they are still sitting with the biased juror) than they are after the verdict is announced and the jurors have gone home. But this is also a questionable empirical assessment, and the Court's seat-of-the-pants judgment is no better than that of those with the responsibility of drafting and adopting federal and state evidence rules. There is no question that jurors *do* report biased comments made by fellow jurors prior to the beginning of deliberations. See, *e.g., United States* v. *McClinton*, 135 F. 3d 1178, 1184-1185 (CA7 1998); *United States* v. *Heller*, 785 F. 2d 1524, 1525-1529 (CA11 1986); *Tavares* v. **[**140]** *Holbrook*, 779 F. 2d 1, 1-3 (CA1 1985) (Breyer, J.); see Brief for Respondent 31-32, n. 10; Brief for United **[***61]** States as *Amicus Curiae* 31. And the Court marshals no evidence that such pre-deliberation reporting is rarer than the post-verdict variety.

Even if there is something to the distinction that the Court makes between pre- and post-verdict reporting, it is debatable whether the difference is significant enough to merit different treatment. This is especially so because post-verdict reporting is both more disruptive and may be the result of extraneous influences. A juror who is initially in the minority but is ultimately persuaded by other jurors may have second thoughts after the verdict is announced and may be angry with others on the panel who pressed for unanimity. In addition, if a verdict is unpopular with a particular juror's family, friends, employer, co-workers, or neighbors, the juror may regret his or her vote and may feel pressured to rectify what the jury has done.

In short, the Court provides no good reason to depart from the calculus made in  and *Warger.* Indeed, the majority itself uses hedged language and appears to recognize that this "pragmatic" argument is something of a makeweight. *Ante*, at ___ - ___, 197 L. Ed. 2d, at 124-125 (noting that

the argument is "not dispositive"); *ante*, at ___, 197 L. Ed. 2d, at 124 (stating **[***62]** that the operation of the safeguards "may be compromised, or they may prove insufficient").

III

A

The real thrust of the majority opinion is that the Constitution is less tolerant of racial bias than other forms of juror misconduct, but it is hard to square this argument with the nature of the Sixth Amendment right on which petitioner's argument and the Court's holding are based. What the Sixth Amendment protects is the right to an "impartial jury." Nothing in the text or history of the Amendment or in the inherent nature of the jury trial right suggests that the extent of the protection provided by the Amendment depends on the nature of a jury's partiality or bias. As the Colorado Supreme Court aptly put it, it is hard to "discern a dividing line between different *types* of juror bias or misconduct, whereby one form of partiality would implicate a party's Sixth Amendment right while another would not." 350 P. 3d 287, 293, 2015 CO 31 (2015). [11]

**[*883]** Nor has the Court found any decision of this Court suggesting that the Sixth Amendment recognizes some sort of hierarchy of partiality or bias. The Court points to a line of cases holding that, in some narrow circumstances, the Constitution requires trial courts to conduct *voir dire* on the subject of race. Those decisions, however, were **[***63]** not based on a ranking of types of partiality but on the Court's conclusion that in certain cases racial bias was especially likely. See *Turner,* 476 U. S., at 38, n. 12, 106 S.

---

[11] The majority's reliance on footnote 3 of *Warger, ante*, at ___ - ___, 197 L. Ed. 2d, at 121-122, is unavailing. In that footnote, the Court noted that some "cases of juror bias" might be "so extreme" as to prompt the Court to "*consider* whether the usual safeguards are or are not sufficient to protect the integrity of the process." 574 U. S., at ___-___, n. 3, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422, 432 ) (emphasis added). Considering this question is very different from adopting a constitutionally based exception to long-established no-impeachment rules.

Ct. 1683, **[\*\*141]** 90 L. Ed. 2d 27 (plurality opinion) (requiring *voir dire* on the subject of race where there is "a particularly compelling need to inquire into racial prejudice" because of a qualitatively higher "risk of racial bias"); *Ristaino*, 424 U. S., at 596, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (explaining that the requirement applies only if there is a "constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be [impartial]"). [12] Thus, this line of cases does not advance the majority's argument.

It is undoubtedly true that "racial bias implicates unique historical, constitutional, and institutional concerns." *Ante*, at ___, 197 L. Ed. 2d, at 124. But it is hard to see what that has to do with the scope of an *individual criminal defendant's* Sixth Amendment right to be judged impartially. The Court's efforts to reconcile its decision with *McDonald*, *Tanner*, and *Warger* illustrate the problem. The Court writes that the misconduct in those cases, while "troubling and unacceptable," was "anomalous." *Ante*, at ___, 197 L. Ed. 2d, at 124. By contrast, racial bias, the Court says, is a "familiar and recurring evil" that causes "systemic injury to the administration **[\*\*\*64]** of justice." *Ante*, at ___, 197 L. Ed. 2d, at 124.

Imagine two cellmates serving lengthy prison terms. Both were convicted for homicides committed in unrelated barroom fights. At the trial of the first prisoner, a juror, during deliberations, expressed animosity toward the defendant because of his race. At the trial of the second prisoner, a juror, during deliberations, expressed animosity toward the defendant because he was wearing the jersey of a hated football team. In both cases, jurors come forward after the trial and reveal what the biased juror said in the jury room. The Court would say to the first prisoner: "You are entitled to introduce the jurors' testimony, because racial bias is damaging to our society." To the second, the

Court would say: "Even if you did not have an impartial jury, you must stay in prison because sports rivalries are not a major societal issue."

This disparate treatment is unsupportable under the Sixth Amendment. If the Sixth Amendment requires the admission of juror testimony about statements or conduct during deliberations that show one type of juror partiality, then statements or conduct showing any type of partiality should be treated the same way.

B

Recasting this as an equal protection case would not **[\*\*\*65]** provide a ground for limiting the holding to cases involving racial bias. At a minimum, cases involving bias based on any suspect classification—such as national origin [13] or religion [14]—would merit equal treatment. So, I think, would **[\*884]** bias based on sex, *United States* v. **[\*\*142]** *Virginia*, 518 U. S. 515, 531, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996), or the exercise of the First Amendment right to freedom of expression or association. See *Regan* v. *Taxation With Representation of Washington*, 461 U. S. 540, 545, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983). Indeed, convicting a defendant on the basis of any irrational classification would violate the Equal Protection Clause.

Attempting to limit the damage worked by its decision, the Court says that only "clear" expressions of bias must be admitted, *ante*, at ___, 197 L. Ed. 2d, at 125, but judging whether a statement is sufficiently "clear" will often not be easy. Suppose that the allegedly biased juror in this case never made reference to Peña-Rodriguez's race or national origin but said that he had a lot of

---

[12] In addition, those cases did not involve a challenge to a long-established evidence rule. As such, they offer little guidance in performing the analysis required by this case.

[13] See *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).

[14] See, *e.g.*, *United States* v. *Armstrong*, 517 U. S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996); *Burlington Northern R. Co.* v. *Ford*, 504 U. S. 648, 651, 112 S. Ct. 2184, 119 L. Ed. 2d 432 (1992); *New Orleans* v. *Dukes*, 427 U. S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976) (*per curiam*).

experience with "this macho type" and knew that men of this kind felt that they could get their way with women. Suppose that other jurors testified that they were certain that "this macho type" was meant to refer to Mexican or Hispanic men. Many other similarly suggestive statements can easily be imagined, and under today's decision it will be difficult for judges to discern the dividing line [***66] between those that are "clear[ly]" based on racial or ethnic bias and those that are at least somewhat ambiguous.

IV

Today's decision—especially if it is expanded in the ways that seem likely—will invite the harms that no-impeachment rules were designed to prevent.

First, as the Court explained in *Tanner*, "postverdict scrutiny of juror conduct" will inhibit "full and frank discussion in the jury room." 483 U. S., at 120-121, 107 S. Ct. 2739, 97 L. Ed. 2d 90; see also *McDonald*, 238 U. S., at 267-268, 35 S. Ct. 783, 59 L. Ed. 1300 (warning that the use of juror testimony about misconduct during deliberations would "make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference"). Or, as the Senate Report put it: "[C]ommon fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation." S. Rep., at 14.

Today's ruling will also prompt losing parties and their friends, supporters, and attorneys to contact and seek to question jurors, and this pestering may erode citizens' willingness to serve on juries. Many jurisdictions now [***67] have rules that prohibit or restrict post-verdict contact with jurors, but whether those rules will survive today's decision is an open question—as is the effect of this decision on privilege rules such as those noted at the outset

of this opinion. [15]

[*885] Where post-verdict approaches are [**143] permitted or occur, there is almost certain to be an increase in harassment, arm-twisting, and outright coercion. See *McDonald, supra*, at 267, 35 S. Ct. 783, 59 L. Ed. 1300; S. Rep., at 14 (explaining that a laxer rule "would permit the harassment of former jurors by losing parties as well as the possible exploitation of disgruntled or otherwise badly-motivated ex-jurors"); 350 P. 3d, at 293. As one treatise explains, "[a] juror who reluctantly joined a verdict is likely to be sympathetic to overtures by the loser, and persuadable to the view that his own consent rested on false or impermissible considerations, and the truth will be hard to know." 3 C. Mueller & L. Kirkpatrick, Federal Evidence §6:16, p. 75 (4th ed. 2013).

The majority's approach will also undermine the finality of verdicts. "Public policy requires a finality to litigation." S. Rep., at 14. And accusations of juror bias—which may be "raised for the first time days, weeks, or months after the verdict"—can "seriously disrupt [***68] the finality of the process." *Tanner, supra*, at 120, 107 S. Ct. 2739, 97 L. Ed. 2d 90. This threatens to "degrad[e] the prominence of the trial itself" and to send the message that juror misconduct need not be dealt with promptly. *Engle* v. *Isaac*, 456 U. S. 107, 127, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982). See

---

[15] The majority's emphasis on the unique harms of racial bias will not succeed at cabining the novel exception to no-impeachment rules, but it may succeed at putting other kinds of rules under threat. For example, the majority approvingly refers to the widespread rules limiting attorneys' contact with jurors. *Ante*, at ___ - ___, 197 L. Ed. 2d, at 125-126. But under the reasoning of the majority opinion, it is not clear why such rules should be enforced when they come into conflict with a defendant's attempt to introduce evidence of racial bias. For instance, what will happen when a lawyer obtains clear evidence of racist statements by contacting jurors in violation of a local rule? (Something similar happened in *Tanner*. 483 U. S., at 126, 107 S. Ct. 2739, 97 L. Ed. 2d 90.) It remains to be seen whether rules of this type—or other rules which exclude probative evidence, such as evidentiary privileges—will be allowed to stand in the way of the "imperative to purge racial prejudice from the administration of justice." *Ante*, at ___, 197 L. Ed. 2d, at 122.

H. R. Conf. Rep. No. 93-1597, at 8 ("The Conferees believe that jurors should be encouraged to be conscientious in promptly reporting to the court misconduct that occurs during jury deliberations").

The Court itself acknowledges that strict no-impeachment rules "promot[e] full and vigorous discussion," protect jurors from "be[ing] harassed or annoyed by litigants seeking to challenge the verdict," and "giv[e] stability and finality to verdicts." *Ante*, at ___, 197 L. Ed. 2d, at 119. By the majority's own logic, then, imposing exceptions on no-impeachment rules will tend to defeat full and vigorous discussion, expose jurors to harassment, and deprive verdicts of stability.

The Court's only response is that some jurisdictions already make an exception for racial bias, and the Court detects no signs of "a loss of juror willingness to engage in searching and candid deliberations." *Ante*, at ___, 197 L. Ed. 2d, at 126. One wonders what sort of outward signs the Court would expect to see if jurors in these jurisdictions do not speak as freely in the jury room as their counterparts [***69] in jurisdictions with strict no-impeachment rules. Gathering and assessing evidence regarding the quality of jury deliberations in different jurisdictions would be a daunting enterprise, and the Court offers no indication that anybody has undertaken that task.

In short, the majority barely bothers to engage with the policy issues implicated by no-impeachment rules. But even if it had carefully grappled with those issues, it still would have no basis for exalting its own judgment over that of the many expert policymakers who have endorsed broad no-impeachment rules.

 [**144] V

The Court's decision is well-intentioned. It seeks to remedy a flaw in the jury trial system, but as this Court said some years ago, it is questionable whether our system of trial by jury can endure this attempt to perfect it. *Tanner*, 483 U. S., at 120, 107 S. Ct. 2739, 97 L. Ed. 2d 90.

I respectfully dissent.

## References

U.S.C.S. Court Rules, Federal Rules of Evidence, Rule 606(b)

12 Moore's Federal Practice § 59.13 (Matthew Bender 3d ed.)

L Ed Digest, Trial § 351

L Ed Index, New Trial

Use of peremptory challenges to exclude persons from jury on basis of race or color--Supreme Court cases. 131 L. Ed. 2d 1123.

Effect of accused's federal constitutional rights on scope of voir dire examination of prospective jurors--Supreme Court cases. 114 L. Ed. 2d 763.

Group or class discrimination in selection of [***70] grand or petit jury as prohibited by Federal Constitution--Supreme Court cases. 33 L. Ed. 2d 783.

Comment Note.--What provisions of the Federal Constitution's Bill of Rights is applicable to the states. 18 L. Ed. 2d 1388, 23 L. Ed. 2d 985.

Race discrimination--Supreme Court cases. 94 L. Ed. 1121, 96 L. Ed. 1291, 98 L. Ed. 882, 100 L. Ed. 488, 3 L. Ed. 2d 1556, 6 L. Ed. 2d 1302, 10 L. Ed. 2d 1105, 15 L. Ed. 2d 990, 21 L. Ed. 2d 915.

**End of Document**